SPRINGER ет ux. *v.* KOROTKI ет ux.

[No. 110, September Term, 1957.]

*Decided January 20, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Richard H. Lerch* for the appellants.

*Arnold Fleischmann,* with whom were *Abraham Levin, H. Richard Smalkin, A. Frederick Taylor* and *Smalkin, Hessian, Martin & Taylor* on the brief, for the appellees.

HAMMOND, J., delivered the opinion of the Court.

Springer bought a neighborhood grocery business from his friend, Korotki, and after continuing it for over a year, discovered to his own satisfaction that, in inducing the sale, Korotki, by word and deed, had misrepresented the weekly dollar volume of the store's sales. He promptly filed a bill for rescission. The chancellor decided that the testimony Springer produced was not definite, clear and convincing enough to sustain his charges, and dismissed the bill. Springer appeals.

Before they came to this country, the two had known each other beyond the seas. Korotki came here first. When Springer followed, he looked up Korotki and, for a time, lived with his friend. Desiring to set himself up in business so that he could bring his wife over, he asked about buying the grocery business. He says Korotki told him he used to take in $1,000 a week but that after he bought a laundry he had to divide his time, and the sales fell to about $800 a week. A witness for Springer said Korotki told him that the weekly sales at the time of the sale were "about $800, sometimes a little over, sometimes a little shorter."

The parties entered into a written agreement, dated August 9, 1955, wherein for a price of $5,000—which Springer bor-

rowed from a bank and which Korotki says was $500 less than he could have gotten elsewhere, because Springer had once saved his life—the business, good will, trade name and its "fixture chattels and equipment" were transferred from seller to buyer.

The seller represented and warranted (a) the regular and customary store hours and (b) that the weekly retail sales of the business "made in the regular, normal and ordinary course of business, for the one week period beginning Tuesday, August 9, 1955, at 5:00 P. M., and ending Monday, August 15, 1955, at 11:00 P. M., shall be absolutely no less than the sum of $650.00 * * *." It was further agreed and covenanted that: "In the event that said sales for said one week period, shall not be as represented and warranted herein, then the Vendees, at their option, may terminate this Agreement * * *."

The store's cash register rang up $742.28 during the test week, and Springer continued to operate the business. Sales began to decline immediately, being $637, $584, $632, $397 (a week of two religious holidays), and $612, for the succeeding five respective weeks. Because of this decline Springer, saying he would take a $2,000 loss and sell out, complained to Korotki, who told him that if he would keep the store for a year, he would help him sell it and that he must not complain but rather tell people business was good and that he made money or he would not otherwise be able to make a sale. Springer then decided to keep the store open much longer than had been customary, particularly on Sundays when, instead of closing at three, he remained open until nine or ten, thus profiting during a time when competitors were closed. In this way he was able to raise the weekly gross sales to some $740 a week on the average. This increase continued until his wife was well along in her first pregnancy, when return was made to the regular hours and sales again declined.

Something over a year after the sale, Springer asked Abram Joyner, who ran a barber shop next door to the grocery, why he had never bought as much since the test week as he had that week. In the course of the conversation that followed,

Joyner said that Korotki had offered him a "special" during August of 1955, telling him that he would refund him fifty cents of each dollar spent during that sale. Korotki had told Joyner not "to go over $10 at a time" and not to tell anyone of the special sale. Joyner testified to these facts and to the fact that he spent between $35 and $45 during the time of the special sale, although this was three or four times what he would normally have spent. He said that each day Korotki would come to the barber shop and refund half of the money he had spent.

Springer's bill for rescission alleged that he had been induced to buy the business by two misrepresentations: first, that Korotki had told him, prior to August 9, 1955, that the gross sales for a week never ran below $650; and that the sales during the test week were not made in the normal course of business but were puffed by Korotki, who had induced various persons to enter the store to make purchases by promising to reimburse them in part for those purchases. The chancellor, in his oral opinion, said that the crux of the matter was whether fraud had been practiced during the test week and that he was faced on the one hand with the testimony of Joyner, and on the other with Korotki's denial that what Joyner alleged ever happened. The chancellor found it impossible to believe that Korotki would perpetrate a base fraud on Springer, who had once saved his life. He concluded: "Legally, the burden of proof has not been met. I cannot accept Jonas' [Joyner's] statement, and Mr. Korotki's absolute, categorical, emphatic denial of his participation of any conspiratorial activities certainly makes it incumbent upon the Court to decide for the defendant in the case."

Fully mindful of the provisions of Maryland Rule 886 a that the judgment of the chancellor will not be set aside on the evidence unless clearly erroneous and that due regard will be given the opportunity of the lower court to judge the credibility of the witnesses, we are constrained to find the chancellor clearly wrong. Springer offered in evidence Korotki's own income tax figures for the first thirty-one weeks of 1955. They showed that the weekly average of gross sales of the store was $549. Korotki, although he denied that he had

ever made any representations or statements that the business did $1,000 or $800 or $700 a week, testified flatly and explicitly several times that he had told Springer before the sale that the weekly gross receipts never went below $650, and that this was an absolute minimum. The clear inference is that these unqualified statements were the basis for the figure set for the test week in the written agreement. It was stated at the argument that August was not a busy season for the store. Manifestly, if $549 was the weekly average for the thirty-one weeks preceding the test week, there must have been many weeks when sales fell below $650. Korotki did not challenge the accuracy of the figures, and he offered no explanation whatever for their obvious conflict with his admitted representations and the minimum in the written agreement. There is further evidence as to the inaccuracy of the representations in the weekly gross business for the five weeks after the sale. In none of these weeks, when the working hours were the same as they had been during Korotki's ownership, did the sales reach $650. In the face of these evidences, recorded in the usual course of business, both before and after the test week, of sales less than $650 a week as a regular occurrence, no explanation was offered, and none suggests itself, as to how the test week in a slack season could produce almost $90 more than $650. The inference seems almost inescapable that some means out of the ordinary was used to produce the added volume. This strong inference supports Joyner's testimony as to how the added volume was created. Joyner's story was essentially unshaken on cross-examination, and no persuasive reason was shown as to why he would fabricate such a detailed happening if it did not occur. Even the cold printed record indicates it would have been improbable that he could have made up the happening and its details.

The written agreement of the parties provided that if the test week did not "in the regular normal and ordinary course of business" produce $650 or more, Springer could terminate the agreement. We think the evidence was clear and convincing that the regular, normal and ordinary course of business was not carried on during the test week and did not

produce $650 in sales, and that Springer may rescind. *Euzent v. Barrash,* 180 Md. 451.

The conclusion we have reached makes it unnecessary to consider, under the facts here, whether the oral representations by Korotki as to the weekly volume could serve as a basis for rescission.

> *Decree reversed, and case remanded for further proceedings not inconsistent with this opinion; costs to be paid by the appellees.*