[Civ. No. 67956. Second Dist., Div. Five. Aug. 17, 1983.]

ELI SASSON et al., Plaintiffs and Respondents, v.
JACK KATASH, Defendant and Appellant.

**COUNSEL**

Ronald M. Cohen for Defendant and Appellant.

Sommers & Taylor and Gretchen Wellman Taylor for Plaintiffs and Respondents.

**OPINION**

**FEINERMAN, P. J.**—Appellant, Jack Katash (Katash), appeals from a judgment against him in an unlawful detainer action.

The trial court found that Katash continued to occupy premises at 354 South Broadway in the City of Los Angeles for five months and nine days after the expiration of a written lease agreement and written lease assumption agreement entered into with respondents Eli and Lillian Sasson (collectively, Sasson). The court also found that Katash's continued possession of the subject premises was "wilful, intentional, deliberate, obstinate and malicious." The court held that the Sassons were entitled to recover damages for the fair rental value of the premises from May 1, 1981, through October 8, 1981 (the holdover period), at a rate of $5,000 per month (for a total of $26,333.36) and imposed punitive damages amounting to $40,166.64. Judgment was entered in Sasson's favor in the amount of $66,500.

I

SUBPOENA OF SASSON'S BANK RECORDS

Approximately six to four days prior to trial, Katash had two civil subpoenas duces tecum issued and served upon the Custodian of Records of the Bank of America, 7255 Greenleaf Avenue, Whittier, California, ordering him to produce: (1) "A copy of the lease of the premises located at 350, 352, and 354 So. Broadway, Los Angeles, California 90013 between Eli

Sasson and/or Lillian Sasson and/or Sassony Development Co. as Lessors and Jack Katash and/or Jack Katash dba Lee's Discount, together with all loan applications, financial statements and financial declarations pertaining to loans sought on said premises"; and (2) "A copy of a Lease Agreement between Eli Sasson and/or Lillian Sasson and/or Sassony Development Co. lessors, and Jack Katash dba Lee's Discount, Lessees for the premises located at 354 So. Broadway, Los Angeles, California 90013. Said lease was entered into on or about July 18, 1979."

Sach Smith, vice president and head of the real estate department at the Bank of America Whittier office appeared at trial. When counsel for Katash asked Mr. Smith to produce the requested documents, counsel for Sasson objected on the ground that the subpoenas failed to comply with Code of Civil Procedure section 1985.3.[1] The trial court so found and excluded the subpoenaed documents.

In this appeal, Katash contends that exclusion of the lease agreement dated July 18, 1979, was reversible error. He asserts that the document was not within the "definition or protection of Code of Civil Procedure § 1985.3."

Section 1985.3 protects *personal records* from discovery unless the requesting party complies with certain time and notice requirements.[2]

---

[1]All section references will be to the Code of Civil Procedure unless otherwise specifically designated.

[2]Section 1985.3 as amended became operative approximately three months before the trial of this matter (Stats. 1980, ch. 976, §§ 1, 3, pp. 3101, 3102; Stats. 1981, ch. 227, § 1, p. 1152), and at the time of trial, provided as follows: "(a) For purposes of this section, the following definitions apply: [¶] (1) 'Personal records' means the original or any copy of books, documents or other things pertaining to a consumer and which are maintained by any 'witness' which is a physician, hospital, state or national bank, state or federally chartered savings and loan association, state or federal credit union, trust company, insurance company, attorney, or accountant. [¶] (2) 'Consumer' means any individual, partnership of five or fewer persons, association, or trust which has transacted business with or has used the services of such witness or for whom the witness has acted as agent or fiduciary. [¶] (3) 'Subpoenaing party' means the person or persons causing a subpoena duces tecum to be issued or served in connection with any civil action or proceeding commenced pursuant to this code, but shall not include the state or local agencies described in Section 7465 of the Government Code, or any entity provided for under Article VI of the California Constitution in any proceeding maintained before an adjudicative body of that entity pursuant to the provisions of Chapter 4 (commencing with Section 6000) of Division 3 of the Business and Professions Code. [¶] (b) The date specified in a subpoena duces tecum for the production of personal records shall not be less than 15 days from the date the subpoena is issued. Except as provided in subdivision (e) or (f), at least 15 days prior to the date called for in the subpoena duces tecum for the production of personal records, the subpoenaing party shall do both of the following: [¶] (1) Give constructive notice to the consumer whose records are being sought by delivering a copy of the subpoena duces tecum, of the affidavit supporting the issuance of the subpoena, and of the notice described in subdivision (c) to him personally, or at his last known address, or in accordance with Chapter 5 (commencing with Section 1010) of Title 14 of Part 3, or, if he is a party, to his attorney of record. [¶]

As originally enacted, section 1985.3 defined personal records as "the original or any copy of books, documents or *other things* pertaining to a consumer and which are maintained by any 'witness' which is a physician, hospital, state or national bank, state or federally chartered savings and loan association, state or federal credit union, trust company, insurance company, attorney, or accountant."

 Katash argues that, properly interpreted, and as it should be applied in this case, this section only provides protection for records "relating to checking accounts, savings accounts, and all other records kept and *maintained,* that is *prepared,* in the normal course of the particular relationship of the witness and the party." We do not believe the section is subject to such a restrictive interpretation.

 In *Kite* v. *Campbell* (1983) 142 Cal.App.3d 793 at page 801 [191 Cal.Rptr. 363], we stated: "The appropriate rules of statutory construction were stated in *Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224]: 'We begin with the fundamental rule that a court "should ascertain the intent of the Legislature so as to effectuate the purpose of the law." [Citation.] In determining such intent "[t]he court turns first to the words themselves for the answer." [Citation.] We are required to give effect to statutes "according to the usual, ordinary import of the language employed in framing them." [Citations.] "If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose." [Citation.] "[A] construc-

---

(2) Simultaneously with service of the subpoena duces tecum, serve upon the witness a certificate signed by the subpoenaing party or his attorney, attesting to compliance with paragraph (1). [¶] (c) Every copy of the subpoena duces tecum and affidavit served on a consumer or his attorney in accordance with paragraph (1) of subdivision (b) shall be accompanied by a notice in a typeface designed to call attention to the notice indicating that (1) records about the consumer are being sought from the witness named on the attached subpoena; (2) if the consumer objects to the witness furnishing the records to the party seeking the records, the consumer must file papers with the court within 10 days from the receipt of the subpoena; and (3) if the party who is seeking the records will not agree in writing to cancel or limit the subpoena, an attorney should be consulted about the consumer's interest in protecting the right of privacy. [¶] (d) Any consumer whose personal records are sought by a subpoena duces tecum may, within 10 days from the receipt of the subpoena, bring a motion under Section 1987.1 to quash or modify the subpoena duces tecum. No witness shall be required to produce personal records after receipt of a notice that such a motion has been brought, except upon order of the court in which the action is pending or by agreement of the parties, witnesses, and consumers affected. [¶] (e) Upon good cause shown and provided that the rights of witnesses and consumers are preserved, a subpoenaing party shall be entitled to obtain an order shortening the time for service of a subpoena duces tecum or waiving the requirements of subdivision (b) where due diligence by the subpoenaing party has been shown. [¶] (f) Nothing contained in this section shall be construed to apply to any subpoena duces tecum which does not request the records of any particular consumer or consumers and which does require a custodian of records to delete all information which would in any way identify any consumer whose records are to be produced."

tion making some words surplusage is to be avoided." [Citation.] "When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear." [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. [Citations.]'"

■■■ The usual, ordinary import of the language used in subdivision (a)(1) defining "Personal records" is broadly inclusive. In fact, in 1982, the definition of "personal records" was limited when the Legislature amended section 1985.3, subdivision (a)(1) to provide: "'Personal records' means the original or any copy of books, documents or *other writings* pertaining to a consumer . . . ."[3] (Stats. 1982, ch. 666, § 1.) We believe the subpoenaed lease agreement would come under the more restrictive 1982 definition of personal records, and that it clearly is within the definition of personal records as it existed at the time of trial. Nor do we believe that the word "maintained" must be interpreted to mean, "records prepared." In the course of a business relationship, a consumer often will entrust documents or "things" prepared by a third party to his lawyer, doctor, accountant or banker. We see nothing in this legislation that indicates that such documents or things were meant to be excluded.

The first definition of the word "maintain" in Webster's Third New International Dictionary is "to keep in a state of repair, efficiency, or validity: preserve from failure or decline." The plain meaning of the word is to preserve, not to prepare.

Nor do we believe that the purpose of section 1985.3 is merely to prevent intrusion into records relating to the financial condition of a party as is asserted by Katash. Rather, as we see it, the purpose of section 1985.3 is to protect a consumer's right to privacy (Cal. Const., art. I, § 1) in his personal records maintained, or kept, by his attorney, accountant, doctor, banker, etc. It must be remembered that this section does not create a special privilege as to such records, but merely creates a procedure under which the consumer will be apprised that a litigant is seeking discovery of his personal records, and will be given an opportunity to make a motion to quash the proposed subpoena. It seems most likely that section 1985.3 is a legislative response to *Valley Bank of Nevada* v. *Superior Court* (1975) 15 Cal.3d 652 [125 Cal.Rptr. 553, 542 P.2d 977] wherein the Supreme Court stated, at pages 657-658: "The case involves opposing considerations, per-

---

[3]Evidence Code section 250 defines "writing" as follows: "'Writing' means handwriting, typewriting, printing, photostating, photographing, and every other means of recording upon any tangible thing *any form of communication,* or representation including letters, words, pictures, sounds, or symbols, or combinations thereof." (Italics added.)

sonal and financial, and it is readily apparent that the existing discovery scheme is inadequate to protect the bank customer's right of privacy which now is constitutionally founded. The protection of such right should not be left entirely to the election of third persons who may have their own personal reasons for permitting or resisting disclosure of confidential information received from others. On the other hand, we readily acknowledge that relevant bank customer information should not be wholly privileged and insulated from scrutiny by civil litigants. The Legislature has not so directed, and in expressing a contrary position we said in *In re Lifschutz* (1970) 2 Cal.3d 415, 425 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1], 'In order to facilitate the ascertainment of truth and the just resolution of legal claims, the state clearly exerts a justifiable interest in requiring a businessman to disclose communications, confidential or otherwise, relevant to pending litigation. [Citations.]' [¶] Striking a balance between the competing considerations, we conclude that before confidential customer information may be disclosed in the course of civil discovery proceedings, the bank must take reasonable steps to notify its customer of the pendency and nature of the proceedings and to afford the customer a fair opportunity to assert his interests by objecting to disclosure, by seeking an appropriate protective order, or by instituting other legal proceedings to limit the scope or nature of the matters sought to be discovered.''

We uphold the trial court's implied finding that the subpoenaed documents were within the section 1985.3 definition of "personal records" and that Katash's admitted failure to follow the notice and time procedures set forth in that section justified the exclusion of the requested documents.[4]

In addition, we note in passing, that the requested documents appear not to have been relevant to any of the issues framed by the pleadings. The lease agreement subpoenaed was not the lease agreement upon which the unlawful detainer action was based. That agreement covered a seven-year term from January 1, 1974, to April 30, 1981. That agreement was, of course, introduced as an exhibit at trial. The subpoenaed lease was an entirely different lease claimed by Katash to have been entered into by the parties in 1979. There was no other proof of any kind offered with respect to this alleged lease. ■ The standard governing relevancy of material subpoenaed for trial is different than that governing production for discovery purposes. For discovery purposes, the standard is whether the material sought is relevant to the *subject matter of* the action, but for purposes of a subpoena duces tecum issued to a prospective witness, a proponent must

---

[4]The 1982 amendments to section 1985.3, among other things, added subdivision (j) to section 1985.3, which provides: "Failure to comply with this section shall be sufficient basis for the witness to refuse to produce the personal records sought by a subpoena duces tecum."

show that the matters or things sought are material to the *issues* involved in the case or to the credibility of a witness or hearsay declarant. (Code Civ. Proc., § 1985; *Owens* v. *Palos Verdes Monaco* (1983) 142 Cal.App.3d 855, 870 [191 Cal.Rptr. 381]. *Flora Crane Service, Inc.* v. *Superior Court* (1965) 234 Cal.App.2d 767, 787 [45 Cal.Rptr. 79].)

In his appellate brief Katash suggests that he held over because he was somehow relying on this alleged lease which he attempted to subpoena along with Sasson's bank records. That was not Katash's theory of the case at trial, nor is such a contention raised by the pleadings. At all times it was Katash's theory that he was entitled to rely on Sasson's executed oral promise to renew his lease if Katash would convince his neighbor Nissim Zagha, also a lessee of Sasson's, to give up his right to an option to renew. However, Katash himself testified that Sasson made the promise to renew his lease in the middle of 1980, and one is hard put to understand how a purported lease executed in 1979 could have anything to do with Katash's theory of defense.[5]

## II

### PUNITIVE DAMAGES

■ Katash contends that the trial court abused its discretion in awarding punitive damages in this case.

■ "In an unlawful detainer action, treble damages properly are awarded against a defendant if malice is pleaded and proved. [Citation.] It must be established that defendant willfully, deliberately, intentionally and obstinately withholds possession of the property with knowledge of the termination of his lease and against the will of the landlord." *Fifth & Broadway Partnership* v. *Kimny, Inc.* (1980) 102 Cal.App.3d 195, 204 [162 Cal.Rptr. 271, 7 A.L.R.4th 580]; *Buck* v. *Morrossis* (1952) 114 Cal.App.2d 461, 466-467 [250 P.2d 70]; Code Civ. Proc., §§ 735, 1174, subd. (b).)

■ In this case the evidence showed, and the trial court found, that on January 15, 1981, three and one-half months prior to the expiration of the lease, Sasson's attorney sent Katash a letter advising Katash that his lease

---

[5]At oral argument counsel for Katash suggested that the excluded 1979 lease might have been used to impeach Sasson's testimony that he had never entered into any lease with Katash other than the lease on which he brought this suit. This argument has no vitality. We have fleshed out the record, and at no time during the trial was it suggested that the 1979 lease might be used to impeach Sasson. In any event, the fact that the document was usable for impeachment purposes would not excuse Katash's failure to comply with Code of Civil Procedure section 1985.3.

was to expire on April 30, 1981, and informing him that Sasson did not intend to renew it. Thereafter, on March 5, 1981, Katash's attorney wrote a letter to Sasson's counsel wherein he stated that "under no circumstances will Mr. Katash vacate the premises voluntarily." He stated further that Katash claimed to be relying on an "executed oral promise" by Sasson and that Katash would "not vacate the premises without an adequate legal fight asserting his rights." On April 10, 1981, Sasson wrote a personal letter to Katash wherein he informed Katash that he had entered into a lease agreement for the premises with a new tenant who was due to move in on May 1, 1981, the day after expiration of Katash's lease.

Katash claimed he held over because Sasson had promised him a new lease if he would convince his neighbor Zagha to give up his option to renew his lease with Sasson. However, Zagha himself testified that his motivation in renegotiating the lease came from a different source. Sasson had been attempting to sell his building. The record reflects the fact that an escrow had opened on a sale in 1980 which later fell through. Zagha's lease with Sasson provided that the lessor could terminate the lease if the building were sold. Zagha testified that he decided to renegotiate because then he at least would have "some lease," and "that was the main reason" that he renegotiated, or negotiated a new lease. He also testified that Katash was not present when he and Sasson negotiated the terms of the new lease, which was entered into on December 22, 1980.

It is clear from the evidence that, at the time Katash's lease as to the subject premises expired, he knew he had no new lease with Sasson, he was on notice that his old lease would not be renewed, and he had no reasonable belief that he would be granted a new lease by Sasson. The evidence showed that Katash held over knowing he had no claim to the property. In making its ruling on the punitive damages issue, the court stated: "I will further find that the defendant held over with malice, as defined in C.C.P. 1174(b). In this connection, I comment beyond accepting the arguments of Mr. Sommers [counsel for Sasson] that, in any case, all that Mr. Katash had was an action for breach of contract. This was not convertible into a new lease. Even if he believed that he was promised same, he had very ample opportunity—or notice before April 30, to vacate the premises, and his holding over thereafter and to this date has been malicious within the definition set out in 1174(b)."

We hold that the trial court did not abuse its discretion in assessing punitive damages in this matter. (*Whipple* v. *Haberle* (1963) 223 Cal.App.2d 477, 485 [36 Cal.Rptr. 9]; *Gwinn* v. *Goldman* (1943) 57 Cal.App.2d 393, 401-403 [134 P.2d 915].)

The judgment is affirmed.

Stephens, J., and Ashby, J., concurred.