[No. B010040. Second Dist., Div. Seven. Oct. 16, 1985.]

EVA ROTH, Plaintiff and Respondent, v.
MORTON'S CHEFS SERVICES, INC., Defendant and Appellant.

**COUNSEL**

Robert S. Gerstein, Steiner & Gerstein and Stanley H. Stone for Defendant and Appellant.

Mulryan & Fuchs and John R. Fuchs for Plaintiff and Respondent.

OPINION

**POUNDERS, J.***—This action arose when plaintiff Eva Roth filed an unlawful detainer action as lessor against lessee, defendant Morton's Chefs Services, Inc. (Chefs), which had subleased to codefendant Soto Provision, Inc. (Soto), a California corporation.[1] In settlement of that action, judgment was rendered pursuant to a stipulation dated September 16, 1983, which was supervised by the court. Three months later, on December 16, 1983, plaintiff moved to set aside the stipulation, which was granted, and for other relief, which was denied. This appeal arises from a judgment entered against defendant at the conclusion of the subsequent court trial.

On appeal defendant Chefs contends that the court abused its discretion in setting aside the stipulation, that punitive damages in the amount of $20,000 were improperly assessed, and that forfeiture of the lease was an improper remedy in view of substantial compliance with the condition requiring consent for a sublease.

### STATEMENT OF FACTS

Plaintiff was the owner of an 8,000-square-foot industrial building located at 649 S. Gladys Avenue in Los Angeles. This building was leased to defendant Chefs, a wholesale restaurant food supply company, at the rate of $1,404.50 per month, for a 10-year period by written agreement dated October 10, 1978. Conditions of the lease included a specification that the premises would be used only for the wholesale food supply business and that defendant Chefs could not sublease or assign the premises without prior written consent of plaintiff, which consent could not be unreasonably withheld.

In approximately January of 1983, the three owners of defendant Chefs—Clement and Herbert Birnbaum and Morris Kaplan—decided to sell their business and ultimately negotiated the sale with Apex Wholesale Produce Co. (Apex). The sale included defendant Chefs' goodwill and use of its name along with a stipulation not to compete with Apex for six years in Los Angeles County. The agreement was signed in February or March 1983 and took effect May 16, 1983.

On March 30, 1983, defendant Chefs and codefendant Soto executed a written sublease providing for use of the entire premises of plaintiff's industrial building, commencing May 15, 1983, at the rate of $2,700 per

---

*Assigned by the Chairperson of the Judicial Council.
[1]Codefendant Soto is not involved in this appeal.

month for the balance of the term of the lease. The owner of defendant Soto, John R. Renna, Jr., took the sublease to his attorney prior to executing it. That attorney informed him that he needed plaintiff's permission for the sublease. Mr. Renna discussed this requirement with Clement Birnbaum at the time the sublease was executed and was informed that plaintiff's permission to sublease had been obtained.

In fact, no contact had been made with the plaintiff regarding a sublease. During a telephone call on April 4 or 5 to Henry S. Rose, who was plaintiff's son-in-law, Clement Birnbaum told him that defendant Chefs was considering subleasing a small portion of the premises, possibly 10 or 20 percent, and needed plaintiff's permission to do so. By letter dated April 5, 1983, Clement Birnbaum wrote to Mr. Rose pursuant to the telephone conversation indicating his desire to sublease approximately half of the space.

On April 8, 1983, Mr. Rose called Clement Birnbaum to ask why the space had grown to approximately half of that used by defendant Chefs. Clement Birnbaum explained that he would be giving Mr. Renna a small amount of the space but would also include the refrigeration equipment on the premises. He did not say that he had already sublet the entire premises to codefendant Soto.

By letter dated April 11, 1983, Mr. Rose gave plaintiff's approval for the sublease of "part of the premises." On May 15, 1983, defendant Chefs vacated the premises except for a computer and some unused files, and codefendant Soto moved into the premises.

Subsequently, plaintiff telephoned defendant Chefs on June 2d to inquire about a late rent check and found that the phones had been disconnected. She was referred to Apex and then to Mr. Renna and thereafter to Mark Birnbaum, who stated that defendant Chefs was no longer in business and had sold the lease.

Aileen Leavitt, one of plaintiff's daughters, then became involved and subsequently obtained a copy of the sublease from Mr. Renna, showing that the entire premises had been sublet for $2,700 per month. From Clement Birnbaum she obtained another copy of the March 30, 1983, sublease which differed to the extent that it contained language limiting the sublease to "approximately 50 percent of the available floor space."

During a subsequent telephone conversation with Clement Birnbaum, Mr. Rose asked why defendant Chefs was no longer occupying the premises. He replied that he was occupying the premises. He said that he and his son had

records and a computer along with other things there, and that they were still there themselves and would continue to be there.

On June 17, 1983, plaintiff served a three-day notice to quit upon defendant Chefs and codefendant Soto, charging them with a noncurable breach of the lease due to the unlawful subletting. Service was made on Mr. Renna and Morris Kaplan. Thereafter on June 24, 1983, Herbert Birnbaum gave Mr. Renna a letter stating that he was using only 50 percent of the premises, asking him to place it on codefendant Soto's letterhead and mail it to plaintiff. Mr. Renna did not do so.

On September 16, 1983, the date of the stipulation to settle this suit, plaintiff learned that approximately $50,000 of industrial laundry cleaning equipment was missing from the premises still occupied by codefendant Soto.

DISCUSSION

I

ABUSE OF DISCRETION IN SETTING ASIDE THE SETTLEMENT STIPULATION

■ In support of its contention that the trial court abused its discretion in setting aside the stipulation which resulted in the settlement of the unlawful detainer lawsuit, defendant Chefs accurately points out that public policy has long supported pretrial settlements, which are highly favored as productive of peace and goodwill in the community. (*Gopal* v. *Yoshikawa* (1983) 147 Cal.App.3d 128, 130 [195 Cal.Rptr. 36].) He cites *Greyhound Lines, Inc.* v. *Superior Court* (1979) 98 Cal.App.3d 604, 608 [159 Cal.Rptr. 657], for the proposition that: "It is common knowledge in the legal profession that judicially supervised settlement conferences are critical to the efficient administration of justice in California. When the material terms of the settlement are agreed upon at the conference, the agreement must be enforced by the court."

■ A stipulated settlement is not so important, however, that it will withstand all attacks and must be supported at all costs. Ordinarily a party may be relieved from a stipulation upon timely application to the court and a hearing made on affidavits. The court thereafter exercising "its sound discretion, may set aside a stipulation entered into through inadvertence, excusable neglect, fraud, mistake of fact or law, where the facts stipulated have changed or there has been *a change in the underlying conditions* that could not have been anticipated, or where *special circumstances* exist rendering it unjust to enforce the stipulation." (*L. A. City Sch. Dist.* v. *Landier*

*Inv. Co.* (1960) 177 Cal.App.2d 744, 750 [2 Cal.Rptr. 662]; italics added.) This procedure is codified by section 473 of the Code of Civil Procedure, which provides in part: "The court may, upon such terms as may be just, relieve a party or his or her legal representative from a judgment, order, or other proceeding taken against him or her through his or her mistake, inadvertence, *surprise* or excusable neglect." (Italics added.)

■ Section 473 is applied liberally where there is a prompt request for relief and the party opposing the motion will not suffer prejudice if relief is granted. Further, "any doubts in applying section 473 must be resolved in favor of the party seeking relief," because the law "strongly favors trial and disposition on the merits." (*Elston* v. *City of Turlock* (1985) 38 Cal.3d 227, 233 [211 Cal.Rptr. 416, 695 P.2d 713]; see also *Brown* v. *Superior Court* (1935) 10 Cal.App.2d 365, 367 [52 P.2d 256].)

■ Reviewing the evidence in light of the above authorities, we conclude, as did the trial court, that special circumstances exist rendering it unjust to enforce the stipulation. This stipulation terminating the prior litigation was complex but may be summarized as having substituted codefendant Soto for defendant Chefs as lessee, requiring codefendant Soto to pay plaintiff the sum of $5,400 rent, giving codefendant Soto the opportunity to terminate the lease upon 90 days' written notice given after January 1, 1984, and prior to September 1, 1984, requiring plaintiff to reimburse defendant Chefs in the sum of $2,809 forthwith, requiring defendant Chefs to remove furniture and personal property from the premises, providing that defendant Chefs owed plaintiff $3,000 plus $2,500 in the event defendant Chefs did not satisfactorily repair the building ceiling, and most importantly requiring that the court appoint an appraiser to determine the present value of defendant Chefs' refrigeration boxes, freezer, and compressors on the premises for which plaintiff would pay at the rate of $1,300 per month.

In her declaration in support of the motion to set aside the stipulation, Rosalie Morton, one of plaintiff's daughters, indicated plaintiff's reliance upon an appraisal of this equipment received by Mr. Renna which valued it at $6,000. The declaration further revealed that the $1,300 per month payment for the refrigeration equipment was the result of calculating the increase in rental payments due to the additional rental now being paid by codefendant Soto directly to plaintiff instead of to defendant Chefs. In view of plaintiff's limited income and the calculation that the additional rent was certain for no more than nine months, the appraisal at $41,955 was excessive.

Although the trial court did not recall a specific dollar value, the court concluded that "the discussion then had with all sides led the court to be-

lieve that a realistic appraisal would have been substantially less" and that the court "was very much surprised that the appraisal was so high." For these reasons and also because the appraisal both included material that was not to be appraised and used a questionable method of appraisal, the trial court set aside the stipulation.

We find the facts of this case to be more than sufficient to support the trial court's determination that enforcement of this stipulation "would be grossly unfair to the plaintiff." The seven-fold increase in the cost to plaintiff was a stark surprise.

## II

### SUBSTANTIAL COMPLIANCE WITH THE CONDITION OF CONSENT TO THE SUBLEASE

Defendant Chefs next contends that the trial court erred in ordering forfeiture of the lease when there was substantial compliance with the condition requiring consent for the sublease. The argument here is that having gained consent to sublet half of the premises, the breach was "far too trivial" to warrant the imposition of the harsh sanction of forfeiture. Defendant Chefs further argues accurately that an equitable defense to an unlawful detainer action includes the doctrine of substantial compliance. (*Union Oil Co. v. Chandler* (1970) 4 Cal.App.3d 716, 722-723 [84 Cal.Rptr. 756].) Equitable principles apply particularly where a forfeiture is sought in an action for unlawful detainer. (*Schweiger* v. *Superior Court* (1970) 3 Cal.3d 507, 514 [90 Cal.Rptr. 729, 476 P.2d 97].)

The facts of this case, however, do not support defendant Chefs' claim for equitable consideration. There is no claim that defendant Chefs did not realize that consent to sublease was required. In fact, such consent was requested at first for only 10 to 20 percent of the premises and subsequently for as much as 50 percent of the premises against plaintiff's wishes. By concealing the facts that defendant Chefs' business had already been sold, that defendant Chefs could not compete in Los Angeles County with that business, and that a *sublease for the entire premises had already been completed,* defendant Chefs managed to prevail upon plaintiff for consent to sublet one-half of the premises.

These facts vividly reveal the obvious and contemplated fraud of defendant Chefs in order to obtain the difference between the $2,700 monthly payment being made by codefendant Soto and the $1,404.50 payment being made to plaintiff under the lease, resulting in a net monthly benefit of approximately $1,300. Had it succeeded, this fraud would have enabled de-

fendant Chefs to have benefited under the sublease substantially as much as plaintiff, the owner of the premises. Over the five-and-a-half-year remainder of the lease, defendant Chefs' profit would have been $86,150.75.

One of the maxims of jurisprudence is: "No one can take advantage of his own wrong." (Civ. Code, § 3517.) Defendant Chefs' argument reduces to a plea to allow fraudulently obtained consent to sublet half of the premises to expand under operation of law to consent to sublease the entire premises. The corporation would thus take advantage of its own wrong, something that this court is not required to, and will not, permit. ■ Fraud vitiates any colorable claim to substantial compliance.

### III

#### PUNITIVE DAMAGES FOR MALICE IN HOLDING OVER

In a two-pronged attack similar to that raised in the argument above, defendant Chefs argues that there was no evidence here of defendant "willfully, deliberately, intentionally and obstinately" withholding possession of the property with knowledge of termination of the lease, such amounting to malice which entitles plaintiff to punitive damages. (*Fifth & Broadway Partnership* v. *Kimny, Inc.* (1980) 102 Cal.App.3d 195, 204 [162 Cal.Rptr. 271, 7 A.L.R.4th 580]; *Sasson* v. *Katash* (1983) 146 Cal.App.3d 119, 126 [194 Cal.Rptr. 46].)

■ Defendant Chefs first contends that the allegation of malice in holding over after notice was neither alleged nor shown. The record reveals that the complaint clearly alleged "Defendants' continued possession is malicious, and plaintiff is entitled to treble damages." The other half of the argument is just as easily refuted. Having committed an outrageous fraud in an attempt to sublet the entire premises, defendant Chefs fully realized that this blatant fraud breached a condition of the lease against subleting without plaintiff's consent. Therefore, defendant Chefs' holding over after the three-day notice to quit was a clear demonstration of malice.

■ Defendant's next attack on the $20,000 punitive award centers on an interpretation of section 1174, subdivision (b) of the Code of Civil Procedure, which provides in part: "The jury or the court, if the proceedings be tried without a jury, shall also assess the damages occasioned to the plaintiff by any forcible entry, or by any forcible or unlawful detainer, alleged in the complaint and proved on the trial, and find the amount of any rent due, if the alleged unlawful detainer be after default in the payment of rent. If the defendant is found guilty of forcible entry, or forcible or unlawful detainer, and malice is shown, the plaintiff may be awarded *either* dam-

ages and rent found due *or* punitive damages in an amount which does not exceed three times the amount of damages and rent found due. . . ." (Italics added.) Defendant Chefs argues that the judgment rendered herein grants to plaintiff not only actual damages in the form of the rental value but also punitive damages in violation of section 1174. The argument is without merit.

The record reveals that the judgment granting plaintiff the fair market value of the premises was imposed against defendant Chefs *and* codefendant Soto in the total amount of $11,521 after all credits were deducted. The punitive damage award of $20,000 was assessed against defendant Chefs *alone*. Thus, the judgment was in compliance with the intent of the statute. Read in its entirety, the judgment actually provided punitive damages against defendant Chefs in the amount of $31,521, which was less than three times the actual damages of $11,521. This amount was to be reduced by any contribution made by codefendant Soto to the actual damages.

Although defendants may quarrel with the wording of the judgment, its effect is in full compliance with section 1174, subdivision (b). It must be recognized that punitive damages *equal to* actual damages would not be punitive at all. In practical effect, section 1174 allows punitive damages double the actual damages in addition to actual damages. This judgment accomplishes that result while allowing either defendant to pay the actual damages. There was no error.

### DISPOSITION

The judgment is affirmed. Attorney's fees to plaintiff on appeal are awarded pursuant to Civil Code section 1717 and section 16.16 of the lease, which provides that "the prevailing party in any . . . action [to declare rights under the lease], on trial or appeal shall be entitled to his reasonable attorney's fees. . . ." Plaintiff may file a motion for attorney's fees within 30 days from the date of the filing of the remittitur herein.

Thompson, Acting.P. J., and Johnson, J., concurred.

A petition for a rehearing was denied November 12, 1985, and appellant's petition for review by the Supreme Court was denied February 14, 1986.