648 A.2d 993

Gregory Mung Sen TU,

v.

STATE of Maryland.

No. 147, Sept. Term, 1993.

Court of Appeals of Maryland.

Oct. 25, 1994.

Gary S. Offutt, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RODOWSKY, Judge.

This case has been tried to judgment of conviction, appealed, reversed, retried to judgment of conviction, appealed, affirmed, and is now before us on certiorari review of that affirmance. The first conviction was reversed for error in denying the defendant's motion to suppress evidence seized by the police. On direct appeal from the second conviction, and here, the defendant contends that the mandate on the first appeal, and the opinion on which that mandate was based,

foreclose reconsideration by the trial court of the admissibility of the seized evidence. That argument requires us to examine the concept known as "the law of the case."

An agreed statement of facts furnishes the general background.

"Gregory Mung Sen Tu was charged with murdering his wife, Lisa, to whom he had been married for about ten years. There were no witnesses to the murder and Lisa's body was never found. The State's theory was that Tu had hidden the body in a couch on which Lisa normally slept and then had the couch hauled to a county landfill where it was completely incinerated within minutes, precluding its discovery.

"The State's evidence that Lisa Tu was murdered fell into several categories. First, there was evidence of Lisa's sudden and unexplained disappearance on July 13, 1988. Numerous friends, relatives and associates testified that all communication with Lisa ceased as of that date, as did financial transactions on her bank accounts and credit cards. There was also evidence that Lisa had never disappeared before, she had indicated that she had no plans to travel anywhere that summer, and personal possessions, without which Lisa never traveled, were found. The State also showed that blood found in the basement of her home and on the covering of the couch on which she slept was, with a high degree of probability, that of Lisa or a close relative of Lisa's.

"The State's case that Petitioner was the perpetrator of this crime rested on several factors. Tu's possible motives were shown by evidence of Tu's financial difficulties, an insurance policy on Lisa's life under which Tu was the beneficiary, deterioration of the relationship between Tu and Lisa, and Tu's awareness that Lisa was having an affair with another man. Evidence of opportunity included the presence in the house of two knives and Tu's purchase of at least one handgun. The State also presented evidence that, on July 16, Tu arranged for a trash collector to haul away

the couch, notwithstanding that it's condition did not warrant destruction.

"Finally, there was evidence of Tu's conduct following Lisa's disappearance. Shortly after Lisa's disappearance, Tu told relatives that she had flown to California to visit a sick friend, Eve Wang. Wang testified, however, that she had not been sick, that she had not invited Lisa to visit, and that Lisa did not, in fact, visit her after July 12. After Tu learned that he was a suspect, he flew to Taiwan, returned to Maryland briefly for questioning, then flew to Las Vegas, where, despite telling friends here that he was looking for Lisa, he sought employment, gambled, and telephone calls were made from his room to two adult entertainment agencies and a prostitute's beeper.

"The defense sought to show that Lisa had indeed gone to California. Tu produced United Airlines records indicating that a ticket had been issued in the name of L. L. Tu for a flight on July 14, 1988 from Dulles airport to Los Angeles and then to San Francisco, and the airline ticket itself was marked in a way indicating that the ticket had been used from Dulles to Los Angeles. Appellant also presented the testimony of a United Airlines Customer Service Representative, Nancy Mulcahy, who recalled telling a detective in August, 1988, that she saw a woman resembling Lisa board an aircraft for Los Angeles in mid-July of that year. The State responded with evidence that the airline seat for the ticket allegedly used by Lisa Tu on July 14, 1988 was empty. There was also other evidence Ms. Mulcahy may have been mistaken."

(Footnotes and record references omitted).

At his initial trial Tu was convicted of first degree murder and sentenced to life imprisonment. Prior to that trial Tu unsuccessfully had sought to suppress certain evidence seized in Las Vegas, Nevada. Both the circuit court and, on review of the initial conviction, the Court of Special Appeals considered that (1) the State was justifying seizure by a warrant issued for the search of Tu's hotel room, and (2) that the contested items were beyond the scope of the search warrant.

The trial court, however, applied the plain view exception to the warrant requirement.[1] In an unreported opinion (*Tu I* ), the Court of Special Appeals held that the State had not proved the applicability of the plain view exception.

Following reversal, the State determined it would retry Tu. At a hearing prior to retrial the State, over objection by Tu, presented evidence, believed by the trial court, that six of the contested items had not been seized from Tu's hotel room at all. Rather, those six items were obtained from the Las Vegas police, as custodian of the property in Tu's possession when he was arrested. The State also produced evidence showing that a seventh item of evidence seized in the hotel room was indeed within the plain view exception. The circuit court ruled that the seven items would not be suppressed. At the retrial Tu was convicted of second degree murder and sentenced to thirty years.

On Tu's appeal from his second conviction the Court of Special Appeals held that "[t]he 'law of the case' doctrine does not preclude reconsideration of an issue decided in an earlier appeal if the evidence on remand is substantially different." *Tu v. State*, 97 Md.App. 486, 497, 631 A.2d 110, 115 (1993) (*Tu II* ). Tu petitioned, and the State conditionally cross-petitioned, for certiorari. We issued the writ, limited to the following one of the questions presented by Tu:

"Did the trial court err when it held that evidence previously held by the Court of Special Appeals to be inadmissible could be admitted into evidence?"

Addressing that legal question requires understanding the holding of *Tu I*. That understanding, in turn, requires a more detailed statement of the pertinent facts.

## I

The trail leading to the contested evidence begins with a warrant-authorized search by the Montgomery County police

---

1. The judge who presided at the first suppression hearing was not the judge who presided at the second suppression hearing and the retrial.

of the Tus' home in Potomac on September 7, 1988. While there, the police answered a telephone call from a car rental agency, located in the Stardust Hotel in Las Vegas, inquiring about an overdue car rental in Tu's name.[2] After a Maryland arrest warrant was issued on September 9 charging Tu with murder, the warrant was teletyped to the Las Vegas police. The car rental agency, if contacted by Tu, was to arrange to have him return the car in person, and the agency was to alert the Las Vegas police of the arrangements. Tu was arrested at the Stardust Hotel on Saturday, September 10. Montgomery County Detectives Michael Turner (Turner) and Roger Thomson (Thomson), accompanied by an Assistant State's Attorney, went to Las Vegas to continue the investigation and to return the arrestee to Maryland.

Personal belongings in Tu's possession at the time of his arrest and, after exchange for jail garb, his clothing, had been taken into the custody of a Las Vegas law enforcement property custodian who had inventoried the items. The Montgomery County detectives arrived in Las Vegas on the evening of Sunday, September 11. While Turner and local officers interviewed Tu, Thomson photocopied the property custodian's inventory list and Tu's papers and documents that were being held in the custody of the Las Vegas authorities. When Tu was returned to Maryland, the Nevada authorities transferred custody of Tu's belongings to Turner and Thomson. These included six of the contested items of evidence involved in the circuit court ruling which is challenged here. The six items are hereinafter called the "custodial items."

The custodial items are (1) a business card for a Las Vegas restaurant, The Silver Dragon; (2) a Keno card; (3) a greeting card, reading on the outside, "You've got everything that I like," and on the inside, "Good equipment and bad intentions," together with that card's envelope addressed from Tu to a female other than Mrs. Tu; (4) a card with the name Dennis Shostack and a telephone number on the reverse side; (5) Tu's

---

**2.** As we discuss, *infra,* the jury heard evidence that Tu also used assumed names while in Las Vegas.

passport; and (6) a laundry ticket, bearing control number 2042, but not identifying the issuing business, issued to a person named, "Wong," and indicating the charge would be $1.15. Included within the State's theories of the relevance of the custodial items was that they, or their fruits, indicated conduct inconsistent with Tu's statements that he was searching for his missing wife.

In his post-arrest interrogations, Tu told the police that he was staying at the El Rancho Hotel in Las Vegas at the time of his arrest. Turner testified that Tu consented to a police search of his room, but that, out of an abundance of caution, a search warrant was obtained. Tu's room at the El Rancho was searched on Monday, September 12, 1988. Included among the authorized objects of the search were "[c]redit cards and/or receipts of transactions."[3] In a doorless closet, *i.e.*, a small alcove containing a rod from which to hang clothing, hung a freshly laundered shirt in a clear plastic cover, to which was attached a ticket, bearing control number 2011, issued to a person named, "G. Wong," for which the charge was either $1.05 or $1.95. That ticket is the seventh contested item of evidence.

A ruling on a motion to suppress ordinarily is reviewed on the record made at the suppression hearing, standing alone. *McMillian v. State,* 325 Md. 272, 281, 600 A.2d 430, 434–35 (1992); *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990); *Trusty v. State,* 308 Md. 658, 670–72, 521 A.2d 749, 755–56 (1987). The foregoing description of the State's acquisition of the contested exhibits is based upon the transcript of the second suppression hearing. To serve as the record on appeal in this case, the parties furnished only the transcripts of the second suppression hearing and of the retrial, without including any exhibits introduced at either

---

3. Other objects within the scope of the warrant were "[t]race evidence of blood like substance on items of clothing, shoes, etc.; ... [f]inancial records, withdrawals of large sums of cash ... [a]irline ticket documentation; ... .380 caliber handgun and/or other offensive weapons; ... [c]orrespondence to other individuals in approximately the last 60 days; [and l]arge sums of cash."

proceeding and without including the transcript of the first suppression hearing.[4]

With respect to any support at the first suppression hearing for applying the plain view exception, *Tu I* advises:

> "After the application, search warrant, and return were admitted in evidence at the suppression hearing, the State rested. There was no testimony by Detective Turner in response to direct examination or cross-examination as to where or under what circumstances the items in [Tu's] motel were seized."

The Court of Special Appeals, citing *Wiggins v. State*, 315 Md. 232, 250–51, 554 A.2d 356, 364–65 (1989), reasoned that, in order for the plain view exception to apply, the police must have been immediately aware of the evidentiary significance or contraband nature of an item observed. Thus, there was no support at the first suppression hearing for the circuit court's having applied plain view. The Court of Special Appeals, however, did not catalogue items that were to be suppressed.

In reciting the facts. leading up to its above-described holding, the Court of Special Appeals in *Tu I* noted that the parties had not included in the record the application for search warrant, the search warrant, and the return thereon, although these documents had been introduced at the first suppression hearing. The opinion in *Tu I* notes that the court called upon counsel for both parties to supplement the record, but the court had received only the application and the warrant, without the return. In order to state the facts the court turned to Turner's testimony *at trial* in which he apparently described what had been seized from Tu's room. The court divided the items, so described by Turner, between

---

**4.** We have subsequently obtained from the Clerk of the Circuit Court for Montgomery County the exhibits from the second suppression hearing and from the retrial that were in that clerk's possession. We have also caused the record to be further supplemented with the transcript of the first suppression hearing and of the first trial. The transcript of the first suppression hearing confirms that its description in *Tu I* was substantially accurate.

those found in Tu's briefcase and those found elsewhere in the hotel room. To the extent relevant here, the first category included "a communication with a prostitute" (referring to the greeting card described *supra*) and the business card of the Silver Dragon. In the second category the Court of Special Appeals included the keno card and "a dry cleaning receipt indicating [Tu's] use of another false name."

At the second suppression hearing Turner testified that his testimony at the initial trial was mistaken in that he identified custodial items as having been seized when the search warrant was executed at the El Rancho Hotel. Turner explained that he realized his error when reviewing files in the State's Attorney's Office in preparation for the forthcoming retrial of Tu and saw the photocopied inventory list and photocopied documents that Thomson had made from papers and documents already in the custody of the Nevada authorities prior to the search at the El Rancho Hotel. The circuit court at the second suppression hearing found "that the State's position prevails in this case, and the items as requested will be received at trial," thus necessarily finding Turner's testimony at the second suppression hearing to be the fact of the matter.[5]

---

5. Underlying the law of the case issue is Turner's change in his testimony. We do not agree with the characterization by the dissent in the matter *sub judice* that the State had stipulated at the first suppression hearing as to the place where the custodial items had been seized.

Tu's written suppression motion was a form motion that contained no specifics whatsoever. In a brief preliminary statement at the first suppression hearing, the State advised that it would be calling Turner. The State represented that nine search warrants had been executed in three states and that all of the materials seized were seized pursuant to search warrants.

Turner took the stand and, in the course of direct examination, identified the warrant and return for Tu's room at the El Rancho Hotel in Las Vegas.

On cross-examination defense counsel elicited testimony that everything seized from the hotel room was listed on the return of the search warrant. Defense counsel then inquired about derivative evidence. When Turner had no recollection of any evidence derived from some telephone numbers, the following transpired:

Thus, Tu's position on the instant appeal is that, as a matter of law, the circuit court at the second suppression hearing could not consider the materially different facts relating to the custodial items, and could not receive further clarification concerning seizure of the laundry ticket found in the hotel

---

"[PROSECUTOR]: Your Honor, I would proffer what I know, if they would allow it.  I know that there were—

"[DEFENSE COUNSEL]: I will accept the proffer.  I am just trying to find out if there is any—

"[PROSECUTOR]: I know that, for instance, in terms of some of the papers we followed up on a card that was made out to a girl named Terry.

"THE WITNESS: Yes.

"[DEFENSE COUNSEL]: But that was seized from Mr. Tu, wasn't it, as a result of his arrest?

"[PROSECUTOR]: That was in his briefcase, *I believe*—

"THE WITNESS: *That was in his briefcase.*

"[PROSECUTOR]: —and that was seized—.  The card to Terry was in his briefcase in his room when the room in Las Vegas was searched.  There also was a card in the briefcase—and *I am proffer-ing all of this and if the detective's recollection is different, I think these are the facts.*  There was a card and the name of a restaurant on it. . . .

. . . .

"[PROSECUTOR]: Just for the record, I think all the things that I have just indicated I think [defense counsel] either knows about or is available to him in terms of looking at the documents themselves.

"[DEFENSE COUNSEL]: *Except I didn't know where they came from.*

"THE COURT: —know the documents, but I don't know what you might have done as a result.

"[DEFENSE COUNSEL]: Yes, I didn't those [sic] [know?] that the items were in the briefcase.

"BY [DEFENSE COUNSEL]:

"Q  *Just for purposes of the record, Detective Turner, the fact to which [the prosecutor] just proffered, do you believe that to be true and accurate according to your memory?*

"A  *Yes, sir."*

(Emphasis added).

If this were a case in which the State and the accused had stipulated as to the facts, our analytical framework would very likely be different.  In any event, we intimate no opinion as to what the result here would be if the parties indeed had entered into a stipulation of facts.

room. Tu has chosen "law of the case" as the horse to ride to the above-described result, but it will not carry him that far.[6]

## II

■ The law of the case doctrine lies somewhere beyond *stare decisis* and short of *res judicata.* Professor Moore gives the following overview:

"The *law of the case,* like stare decisis, deals with the circumstances that permit reconsideration of issues of law. The difference is that while stare decisis is concerned with the effect of a final judgment as establishing a legal principle that is binding as a precedent in other pending and future cases, the law of the case doctrine is concerned with the extent to which the law applied in decisions at various stages of the same litigation becomes the governing principle in later stages. As applied to interlocutory decisions by the trial court, the principal purpose of the doctrine is efficiency of disposition. It encourages the court to get on with the proceedings, leaving earlier errors, if any, to be corrected on post-trial motion or on appeal. As applied to appellate court decisions, it serves the dual function of enforcing the mandate and precluding multiple appeals to review the same error. Like stare decisis, the doctrine of the law of the case is quite rigidly applied to force obedience of an inferior court, but more flexibly in its application to reconsideration by the court that made the earlier decision."

1B J.W. Moore, J.D. Lucas & T.S. Currier, *Moore's Federal Practice* ¶ 0.401, at I–2 to I–3 (2d ed. 1993) (footnotes omitted) (Moore).

The aspect of the doctrine that Tu argues is called "the mandate rule." *See* Moore ¶ 0.404[10]. "When a case is appealed and remanded, the decision of the appellate court establishes the law of the case, which *must* be followed by the trial court on remand." *Id.* ¶ 0.404[1], at II–3. *See Chayt v. Board of Zoning Appeals,* 178 Md. 400, 13 A.2d 614 (1940)

---

**6.** Tu made no argument before the Court of Special Appeals or in his petition for certiorari based on Maryland Rule 4–252(g)(2). The interpretation and scope of that Rule are not before us.

(trial court on remand may not reduce breadth of appellate-mandated injunction against zoning violation). "What remains within the power of decision of the [trial] court after remand depends, of course[,] on the scope of the mandate." Moore ¶ 0.404[10], at II–61. "When the remand is general, however, the [trial] court is free to decide anything not foreclosed by the mandate." *Id.* at II–63 to II–64.

We have shown that *Tu I* held that the State had failed to prove at the first suppression hearing that the plain view doctrine applied to items, beyond the scope of the warrant, that the court understood were seized at the hotel. Chief Judge Wilner, writing in *Tu II* for the Court of Special Appeals, correctly described that court's earlier holding, saying: "We did not declare the items to be inherently and generically inadmissible but merely inadmissible upon the circumstances presented to us in that case." 97 Md.App. at 498, 631 A.2d at 116. Thus, the circuit court, at the second suppression hearing, did not directly violate the precise holding of *Tu I,* at least as it applies to the custodial items.

At the second suppression hearing the court accepted the State's testimony that the custodial items were not seized at the hotel. Tu does not contend that the custodial items are subject to suppression if they may be considered to have been acquired from the Nevada authorities as described in the testimony at the second suppression hearing. *Cf. Gee v. State,* 291 Md. 663, 435 A.2d 1387 (1981) (where property that was on person of arrestee at time of valid arrest is held in custody of arresting police department, arrestee has no reasonable expectation of privacy in the property sufficient to prevent inspection and seizure as evidence of another crime by another police department).

Consequently, Tu's argument necessarily is that the mandate in *Tu I* implicitly prohibits or limits the trial court from receiving additional or contradictory evidence and from considering a different legal theory—one under which suppression would be denied. In the broadest application of his argument, Tu would have us foreclose, under the law of the

case doctrine, *any* reconsideration by a trial court of the suppression of those items of evidence involved in the appellate ruling granting suppression. Appellate courts that have ruled on suppression issues do not consider that the law of the case doctrine so broadly restricts trial courts on remand.

*United States v. Shotwell Mfg. Co.,* 355 U.S. 233, 78 S.Ct. 245, 2 L.Ed.2d 234 (1957), is one of those cases. In that criminal tax prosecution the defendants had moved in the district court to suppress evidence allegedly obtained by Treasury agents from the defendants pursuant to the voluntary disclosure policy formerly applied by the Treasury Department. The district court denied the motion, holding that the voluntary disclosure was ineffective, but without discussing the fifth amendment. 355 U.S. at 236 n. 5, 78 S.Ct. at 248 n. 5. The court of appeals reversed, concluding that the voluntary disclosure was effective and that the fifth amendment barred the Government's use of the evidence. *Id.* After the Government had petitioned for certiorari, it moved in the Supreme Court for a limited remand to the district court in order to attempt to show that the voluntary disclosure defense was fraudulent and concocted with the assistance of corrupt Treasury agents. *Id.* at 236, 240–41, 78 S.Ct. at 248, 250.

The Court granted the Government's motion. Justice Harlan, writing for the majority, rejected the defendants' fairness argument, for reasons pertinent here.

"Their objection that it is 'unfair' to allow the Government at this stage of the proceedings to 'bolster' the record relating to the suppression issue is likewise unacceptable. It is undeniable, of course, that upon appellate reversal of a conviction the Government is not limited at a new trial to the evidence presented at the first trial, but is free to strengthen its case in any way it can by the introduction of new evidence. We think that in the peculiar circumstances of this case the fair administration of justice requires that the Government should have a similar opportunity here."

*Id.* at 243, 78 S.Ct. at 251.

Justice Black, joined by Chief Justice Warren and Justice Douglas, dissented, but the dissenting justices had no dis-

agreement as to how the mandate of the court of appeals would operate on subsequent proceedings in the district court. Justice Black wrote:

> "As I stated ... the case should simply be left alone and allowed to go back for a new trial. There the Government can offer all the evidence it has *or can secure* so that a new record can be made on the suppression issue. In my judgment it cannot seriously be contended that the Government would be barred from introducing evidence on that issue at a new trial. While it is true that the Court of Appeals ordered the disclosures suppressed, on the evidence in the record then before it, such ruling should not be construed as binding at a new trial where substantial newly discovered evidence is available."

*Id.* at 252, 78 S.Ct. at 256 (emphasis added).

In *Giordenello v. United States*, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), the Court distinguished *Shotwell*. There, at the district court and the court of appeals levels, the accused unsuccessfully had sought to suppress narcotics seized from his person at the time of his arrest under a warrant. The accused contended that the complaint underlying the warrant failed to demonstrate probable cause. In the Supreme Court the Government, for the first time in the litigation, sought to support the arrest and search incident by relying on state law that permitted a warrantless arrest where there was probable cause that the arrestee had committed a felony. 357 U.S. at 487, 78 S.Ct. at 1250. The Court would not consider the new issue as part of the then pending case. Addressing possible disposition of the type that had been made in *Shotwell*, the Court, again speaking through Justice Harlan, said:

> "Nor do we think that it would be sound judicial administration to send the case back to the District Court for a special hearing on the issue of probable cause which would determine whether the verdict of guilty and the judgment already entered should be allowed to stand. The facts on which the Government now relies to uphold the arrest were fully known to it at the time of trial, and there are no special

circumstances suggesting such an exceptional course. Cf. United States v. Shotwell Mfg. Co. ... *This is not to say, however, that in the event of a new trial the Government may not seek to justify petitioner's arrest without relying on the warrant."*

357 U.S. at 488, 78 S.Ct. at 1251 (emphasis added). The Chief Justice, Justice Black, and Justice Douglas joined in the majority opinion in *Giordenello.* Three dissenters (Justices Clark, Burton, and Whittaker) would have considered the warrantless arrest argument in the appeal then before the Court and, *a fortiori,* would not preclude consideration of the issue on remand. *Id.* at 492, 78 S.Ct. at 1253.

*Shotwell* and *Giordenello* involved reversals of convictions by appellate opinions that do not contain any express directions for the scope of proceedings on remand. From those cases we distill that reversal for the erroneous denial of a motion to suppress does not, in and of itself, preclude any trial court reconsideration of the admissibility of the State's evidence that was the subject of the suppression motion, at least if the reconsideration presents a legal theory that was not ruled upon on the prior appeal. Further, facts that are relevant to applying that previously unadjudicated legal theory and that were not previously presented may be considered by the trial court, even if those facts were known to the State at the time of the original trial court ruling.

*Giordenello* was applied in *United States v. Salazar,* 805 F.2d 1394 (9th Cir.1986). The Ninth Circuit reversed a drug crime conviction where the drugs had been seized without a warrant from an automobile occupied by the accused. Although the district court erred by denying suppression in reliance on the automobile exception, the appellate court specifically noted that, in the event of a new trial, *Giordenello* permitted the Government to seek to justify the accused's warrantless arrest on probable cause grounds and to seek to justify the seizure of the drugs as a search incident to arrest. *Id.* at 1400.

Indistinguishable from the instant matter is *State v. Grosvenor*, 402 N.W.2d 402 (Iowa 1987). Grosvenor's first conviction on drug charges was reversed because of the failure to suppress evidentiary items seized from Grosvenor's room under a search warrant that was limited to common areas of the building where Grosvenor resided. The appellate court's opinion reversing the first conviction stated that the items seized included $800 in Grosvenor's wallet, found in a jacket in a closet in his room. *Id.* at 404. Prior to the second trial the state proved that Grosvenor had been arrested in the street and that the wallet containing the $800 had been removed from his person at that time. Admitting the funds into evidence was upheld on appeal from the conviction on retrial. Citing Iowa cases exclusively, the court reasoned that the law of the case doctrine "is not applicable ... if the facts before the court upon the second trial are materially different from those appearing upon the first," and that "the doctrine does not preclude consideration of issues that could have been, but were not, raised in the first appeal." *Id.* at 405.

At least two courts, when applying law of the case, require a preliminary showing before permitting trial court consideration of additional evidence on remand. One is the Appellate Court of Illinois. *See People v. Hattery*, 183 Ill.App.3d 785, 132 Ill.Dec. 58, 539 N.E.2d 368, *cert. denied*, 127 Ill.2d 627, 136 Ill.Dec. 596, 545 N.E.2d 120 (1989). After that court affirmed the denial of an accused's motion to suppress his confession, but reversed on other grounds, the accused was allowed, prior to retrial, to attempt again to show that his confession resulted from a pretextual arrest on an unrelated charge. On appeal from the second conviction the court held that the trial court correctly reconsidered the pretext issue because the "defendant met his burden of showing additional evidence that had become available since his earlier suppression hearing." 132 Ill.Dec. at 73, 539 N.E.2d at 383. But the movant did not show "that the trial court's finding, that defendant's confession was not the product of an unreasonable seizure based on a pretextual arrest, was manifestly erroneous." *Id.* at 81, 539 N.E.2d at 391.

The rule in Colorado seems to be similar to that in Illinois. In *People v. Roybal*, 655 P.2d 410 (Colo.1982), an interlocutory appeal by the state, the court held that because there was no probable cause to arrest the defendant for drunk driving, certain written statements given by the defendant while in custody should be suppressed. Following that appellate decision, but before trial, the defense moved to suppress the results of a blood alcohol test, alleging that the test was also a result of the illegal arrest. The state sought to reopen the question of probable cause and present the testimony of an additional investigating officer, directed to that issue. *People v. Roybal*, 672 P.2d 1003, 1005 (Colo.1983). The trial court would not reopen and, on a second interlocutory appeal, the Colorado Supreme Court again affirmed. *Id.* at 1006. The court, however, commented in *dicta* that "where a trial court's suppression order has been affirmed on interlocutory appeal, we believe that in appropriate circumstances newly-discovered evidence could justify the trial court's reconsideration of its earlier ruling." *Id.* at 1006 n. 7.

In the case before us the State has cited *State v. Edwards*, 214 Conn. 57, 570 A.2d 193 (1990), and *United States v. Eubanks*, 591 F.2d 513 (9th Cir.1979). Tu submits that these cases support his position. In *Edwards* the conviction was reversed because certain evidence should have been suppressed that had been allowed by the trial court on the theory that the police had effected a valid stop and frisk. In remanding, the appellate court said that "[a]s a consequence, the defendant is entitled upon retrial to the suppression of [the evidentiary items] that were illegally seized from his backpack, unless the state adduces an alternate, legitimate ground for their seizure." *Edwards*, 570 A.2d at 203. In *Eubanks* the conviction was reversed because of an insufficient foundation for the co-conspirator exception to the hearsay rule. The court concluded its opinion by saying that "[o]n retrial, the prosecution is not precluded from introducing additional evidence that would permit the inference that Gonzales' statements were made in furtherance of the conspiracy." *Eubanks*, 591 F.2d at 521. Tu considers that statements of the

type found in *Edwards* and *Eubanks* are essential if an appellate court intends to prevent the ordinary operation of the mandate rule and to permit on remand consideration of additional evidence or of an alternative theory bearing on the suppression or admissibility of the same evidence. The State reads these statements as consistent with the *Giordenello–Salazar–Grosvenor* line of cases in that the *Edwards* and *Eubanks* courts are simply describing what is permitted on remand under the ordinary operation of the law of the case doctrine.

Whatever the *Edwards* and *Eubanks* courts might have intended, the rule advocated by the State is better. First, where the decision on appeal will result in a remand and possible retrial, an appellate court cannot predict whether there will be new facts on retrial. It can decide only on the facts before it on the appeal producing the remand. Second, a rule that would preclude correction on remand of inaccuracies in the facts at the first trial, unless the appellate court expressly permitted that to be done, is unworkable from the appellate standpoint. It would mean that appellate courts would have to articulate that which is not decided in remanded cases, as well as that which is decided. Third, the rule for which the State contends is more consistent with the decisions of this Court applying or discussing the law of the case doctrine.

Prior to the instant criminal cause, no Maryland appellate court in a reported decision has dealt with the interplay between suppression motions in criminal cases and the mandate rule subset of the law of the case doctrine. In the civil arena, decisions of this Court have recognized in a variety of contexts that the evidence may change in further trial court proceedings that follow an appellate decision. We present a few illustrations.

The litigation in *Whitridge v. Parkhurst,* 20 Md. 62 (1863), and *Frisby v. Parkhurst,* 29 Md. 58 (1868), involved an oral family settlement in which a mother and her daughter agreed upon the disposition to be made of inherited property on their

deaths. The first appeal affirmed an injunction granted to creditors of the mother. Proof of one of the defenses offered, namely, the existence of the family settlement, rested on the deposition testimony of the family attorney taken in another case. 29 Md. at 60. On the first appeal this Court held that the conversations testified to by the attorney could not prove a binding contract. 20 Md. at 85. Thereafter, in this nineteenth century equity proceeding, the defendants fully deposed the attorney and used the more complete deposition as evidence on the merits. 29 Md. at 63. The final decree, favorable to the creditors, was reversed on the second appeal. This Court said that the attorney "has clearly, distinctly and unequivocally sworn that there was an agreement. . . ." *Id.* at 66. This Court said that "[t]he state of facts, thus presented, is very different from the proof upon the former appeal, and it is admitted by the counsel for the [creditors] that the evidence must be the same to make the decision upon the former appeal binding upon this." *Id.* at 67.

The analogy between the *Parkhurst* litigation and the matter before us is limited. By its nature, an interlocutory injunction is not intended to be a final adjudication of the merits. *See Hunter v. Atchison, Topeka & Sante Fe Ry. Co.,* 188 F.2d 294 (7th Cir.1951); Moore ¶ 0.404[4.–7], at II–38.

The caveat proceedings in *Smith v. Diggs,* 128 Md. 394, 97 A. 712 (1916), and *Diggs v. Smith,* 130 Md. 101, 99 A. 952 (1917), also illustrate a certain lack of rigidity in applying the law of the case doctrine. Issues had been transferred by an orphans' court to a court of law for decision by a jury. The only issue actually submitted to the jury was fraud in procuring the will. The caveators prevailed before the jury, but, on the first appeal, this Court ruled that the court of law erred in failing to instruct the jury "that there was no legally sufficient evidence from which it could find that the will was procured by fraud." 128 Md. at 400, 97 A. at 715. The mandate read: "*Rulings reversed and cause remanded.*" *Id.* On remand the court of law conducted an entirely new trial, at which additional evidence was presented by the caveators. The court of law ruled that the caveators' case was legally insufficient. On the

second appeal this Court made no comment concerning the procedure followed on remand.[7] With respect to the law of the case doctrine, this Court said that "[a]ll that is necessary upon this appeal is to consider to what extent additional testimony adduced at the second trial should operate to modify the conclusion then reached." 130 Md. at 102, 99 A. at 953. The holding on the second appeal was that "[t]he additional testimony offered in this case beyond that which was presented upon the first trial ... was without sufficient probative force to warrant leaving it to a jury...." *Id.* at 105, 99 A. at 955.

In cases where the plaintiff's allegations or proof are determined on the first appeal to be legally sufficient, and, on a second appeal, the defendant questions the legal sufficiency of the proof on remand, it is necessary to determine whether the facts proved are substantially those previously adjudicated. *See Fidelity–Baltimore Nat'l Bank & Trust Co. v. John Hancock Mut. Life Ins. Co.*, 217 Md. 367, 142 A.2d 796 (1958); *Maryland Coal Co. v. Baker*, 85 Md. 688, 36 A. 768 (1897) (memorandum opinion). In other words, facts may change from trial to trial of the same case.

A number of this Court's nineteenth century decisions contain statements to the effect that the mandate rule subset of the law of the case doctrine would not apply where the facts on remand are substantially or materially different from those before the appellate court on the first appeal. See *Baltimore & Ohio R.R. Co. v. Resley*, 14 Md. 424, 440 (1859) ("[A]s the additional evidence does not materially alter the case, those prayers which were then held [7 Md. 297] to be correct must govern the same questions arising on the present record."); *Brown v. Somerville*, 8 Md. 444, 454 (1855) ("Whatever principles were settled on the former appeal must govern this Court on the present, unless the record shows a materially different

---

7. Later decisions of this Court in caveat cases tried on issues in a court of law have recognized that an appellate court may determine that a directed verdict should have been granted and may reverse without a new trial. See *Schmeizl v. Schmeizl*, 184 Md. 584, 42 A.2d 106 (1945); *Johnston v. Schmidt*, 158 Md. 555, 149 A. 283 (1930).

case."); *Preston v. Leighton,* 6 Md. 88, 97 (1854) ("The case being substantially the same [because additional proof did not vary the applicable law], whatever was decided on the former appeal must govern on this.").

Tu relies on the policy of efficiency underlying the law of the case doctrine. He does not cite any authority dealing with suppression issues, but he emphasizes the litigation in *Springer v. Korotki,* 215 Md. 310, 137 A.2d 655 (1958) (*Korotki I*) and particularly in *Korotki v. Springer,* 218 Md. 191, 145 A.2d 767 (1958) (*Korotki II*). The decision in *Korotki II* is distinguishable from the instant matter. Korotki had sold his neighborhood grocery business to his long-time friend, Springer. 215 Md. at 311, 137 A.2d at 656. Under the contract Korotki warranted that sales during a test week prior to closing would be not less than $650. Sales of $742.28 were recorded during the test period. *Id.* at 312, 137 A.2d at 656. Springer closed, but thereafter sales declined. Springer learned from Joyner, the neighborhood barber, that Korotki had repaid Joyner fifty cents on every dollar of purchases that Joyner had made at the grocery during the test period, and that Korotki had pledged Joyner to silence. *Id.* at 313, 137 A.2d at 657.

Springer sued for rescission and restitution in equity. Korotki denied the truth of Joyner's testimony and denied cheating his friend Springer who had once saved Korotki's life. The trial judge, as trier of fact, did not accept Joyner's testimony and found that Springer had not met the burden of proof. *Id.*

In *Korotki I* this Court reversed the trial judge on the evidence, concluding that the findings were "clearly wrong." *Id.* That appellate conclusion rested principally on Korotki's income tax returns which showed that the weekly average of sales was $549 for thirty-one weeks preceding the test week. This Court remanded the case for further proceedings not inconsistent with the opinion. *Id.* at 315, 137 A.2d at 658. Back in the trial court, Korotki sought to present additional evidence directed to showing that Joyner had lied in his testimony. The trial court refused to reopen and entered a

decree awarding Springer his remedy. 218 Md. at 193, 145 A.2d at 768.

In *Korotki II* we affirmed, saying that "this Court adjudicated the issue as to the right to rescission and that becomes the law of the case." *Id.* We explained that the mandate "left open on remand only the question as to the relief that might be necessary or proper to effectuate that purpose." *Id.* at 193–94, 145 A.2d at 768. Further, under former Maryland Rule 871 (now Rule 8–604(d)(1)), dealing with remand, the order and the opinion " 'shall be conclusive as to the points finally decided thereby.' " *Id.* at 194, 145 A.2d at 769.

The *Korotki I* mandate, properly interpreted, had not left open any issues of liability. The mandate in the instant matter is not so limited. When the cause against Tu was returned to the trial court, the judgment of conviction no longer existed, and the trial court was free to make rulings that did not conflict with that which had been decided by the Court of Special Appeals. Further, in *Korotki I* this Court took the highly unusual steps of rejecting trial court fact-findings and of finding contrary facts at the appellate level. Thus, when Korotki sought to prove facts contrary to those found by this Court, he bumped squarely into the mandate rule. Here, the court in *Tu I* did not make fact-findings. It held only that there was no evidence to support the trial court's fact-finding.

At the second suppression hearing in the instant matter the State proved to the satisfaction of the trial court that the custodial items were not seized at the El Rancho Hotel and that the custodial items were not subject to suppression under the actual facts and under a legal theory other than that involved in the decision in *Tu I*. To permit reopening under those circumstances is consistent with the general tenor of this Court's decisions and with the *Giordenello–Salazar–Grosvenor* line of cases. There is no conflict with the law of the case because the holding in *Tu I* adjudicated only those aspects of the suppression/admissibility of the custodial items that were

presented in that appeal. We hold that the custodial items were not barred by the law of the case doctrine.

### III

■ At the second suppression hearing the State also proved that the laundry ticket bearing control number 2011 was seized at the El Rancho Hotel. We shall assume, *arguendo*, that the ticket is not a "receipt" as that term is used in the search warrant, and that it is the "dry cleaning receipt" referred to in *Tu I*. The State undertook to justify admission of the laundry receipt by the plain view doctrine, the same theory on which the trial court had relied at the first suppression hearing. In support of plain view, the State produced at the second suppression hearing additional evidence that was available at the time of the first suppression hearing. We need not decide here whether the law of the case doctrine prohibited the trial court from considering the State's more specific factual explanation for applying plain view.

Assuming, *arguendo*, that the ticket bearing control number 2011 should have remained suppressed on remand, its introduction into evidence at trial was harmless beyond a reasonable doubt. Among the custodial items which we have held were not subject to suppression was laundry receipt bearing control number 2042. That was admitted into evidence at trial. The significance of both receipts is that they bear the name, "Wong," from which the jury might infer that Tu was using an assumed name in order to cover his trail. Thus the ticket numbered 2011 was merely cumulative of ticket numbered 2042.

■ Neither laundry ticket identified the issuing cleaning establishment. The Montgomery County and Las Vegas police canvassed the Las Vegas "Strip" area. They located Duo Cleaners where a laundered and boxed shirt, marked with the laundry's counterpart of ticket numbered 2042, was being held for customer "Wong." From a photograph of Tu the Duo

proprietor identified Tu as "Wong." He also identified Tu as "Wong" in person at trial.[8]

There was other evidence at trial of Tu's false self-identification. Tu stayed at Caesars Palace in Las Vegas from August 15 to August 23, registering in his name but giving a nonexistent address in Los Angeles as his residence. He traveled to Florida and back August 23 to August 25. A Delta Airlines ticket for Tu's return flight from Pensacola to Las Vegas was issued in the name, "T. Gregory." He stayed at the Stardust Hotel from August 25 to August 31, having registered with a second nonexistent Los Angeles address as his residence. On August 31, 1988 he completed a written application for employment at the Silver Dragon Restaurant giving the name, "Gregory Sen," on an application left with the restaurant's hostess. The restaurant's manager interviewed "Gregory Sen" on Sunday, September 4. The hostess and manager each identified Tu as "Gregory Sen," both from a photograph of Tu during the investigation by the police, and in person at trial. A professional poker player from Las Vegas identified Tu at trial as a person, known to him only as "Gregory," with whom the witness had played cards. Gregory told the witness that he was from San Francisco.

Thus, if laundry ticket bearing number 2011 was improperly admitted, the error was harmless beyond a reasonable doubt. *See, e.g., Rubin v. State,* 325 Md. 552, 578, 602 A.2d 677, 690

---

**8.** When the police found ticket 2011 at the El Rancho Hotel, they already legally possessed ticket 2042, which was among the custodial items, discussed *supra.* Even if ticket 2011 is considered, under the law of the case and not under the facts found at the second suppression hearing, to have been illegally seized, the investigation actually conducted by the police demonstrates what they would have done if they had found only ticket 2042. Thus, the exclusionary rule would not bar the evidence given by the laundry proprietor. *See Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377, 387–88 (1984); *Oken v. State,* 327 Md. 628, 654, 612 A.2d 258, 271 (1992); *Stokes v. State,* 289 Md. 155, 163–65, 423 A.2d 552, 556–57 (1980). The exclusionary rule is not intended to put the police in a worse position than they would have occupied had the alleged violation of the accused's rights not occurred. *See Nix, e.g.,* 467 U.S. at 443, 104 S.Ct. at 2508.

(1992). Harmless error is a potential issue in every certiorari review. *See* Rule 8–131(b)(1).

For these reasons the judgment of the Court of Special Appeals is affirmed.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER, GREGORY MUNG SEN TU.*

BELL, Judge, dissenting.

Prior to his first murder trial, Gregory Mung Sen Tu, the petitioner, moved to suppress certain items of physical evidence seized, pursuant to a search and seizure warrant, from his Las Vegas motel room. A hearing was held on the motion, during the course of which the State proffered as to the items seized and the location from which they were seized. The petitioner characterizes the proffer as a stipulation.[1] I agree with that characterization. The stipulation was corroborated by the trial testimony of Officer Turner, one of the Maryland investigating officers.[2] The theory the State offered in sup-

---

1. The majority refers to the six items the State contends were seized by the Las Vegas police incident to Tu's arrest and subsequently inventoried by its property custodian as the "custodial items." They include: "(1) a business card for a Las Vegas restaurant, the Silver Dragon; (2) a Keno card; (3) a greeting card, reading on the outside, "You've got everything that I like," and on the inside, 'Good equipment and bad intentions,' together with that card's envelope addressed from Tu to a female other than Mrs. Tu; (4) a card with the name Dennis Shostack and a telephone number on the reverse side; (5) Tu's passport; and (6) a laundry ticket, bearing control number 2042, but not identifying the issuing business, issued to a person 'Wong,' and indicating the charge would be $1.15." Majority op. at 411–412. It should be noted, however, that the testimony at the first trial, and the evidence at the suppression hearing, indicated that they were in a briefcase which was seized from Tu's motel room.

   The seventh item is a laundry ticket bearing control number 2011 as to which there is no dispute that it was seized from the petitioner's motel room.

2. The State has never denied that it so stipulated. Indeed, as evidenced by the following colloquy, it seems to admit that it did:

   Mr. Wolf: "In fact, Mr. McCarthy stipulated that those items came from the hotel room at the prior hearing. And stipulations, as we have talked about today, are binding in this case.

port of the admissibility of the evidence was the plain view doctrine, contending that the items were legitimately seized because the police were legitimately on the premises and the items were in plain view.

The trial court denied the petitioner's motion to suppress and admitted the evidence. On appeal, reasoning that the State failed to prove the applicability of the plain view doctrine, the Court of Special Appeals reversed, suppressing the evidence and remanding the case to the circuit court for a new trial.

---

> Mr. McCarthy: "... I don't believe I ever did present the Court with a copy of my memorandum on the stipulations, but I will give you that ... But in any case, I would indicate that whenever it comes to stipulations, this is on page three of that particular memorandum, and I think this is basically black letter law, as can be seen by reviewing the law, when there is an allegation of mistake in position of surprise, stipulations are not binding as a matter of law."

Moreover, the transcript of the first suppression hearing supports this construction of what occurred. When, at the first suppression hearing, defense counsel attempted to cross examine Officer Turner regarding "anything that was found as a result of an investigation taken after seizing the petitioner's phone book," the State interrupted and proffered that the items were not seized incident to Tu's arrest, as defense counsel's examination had suggested. It insisted, referring in particular to the greeting card, the Dennis Shostack card, and the Silver Dragon restaurant card, that the items were located in Tu's briefcase, which was seized pursuant to the warrant. Defense counsel accepted the proffer. Officer Turner then confirmed the accuracy of the proffer.

I gather from footnote 5 of the majority's opinion that the majority's rejection of the petitioner's and my contention that the State stipulated to the items seized and their location when seized is based on the fact that Turner was on the witness stand when the State made its proffer and that Turner later confirmed the proffer at the petitioner's request. The majority does not take into account the fact that, prior to Turner's confirmation, defense counsel accepted the State's proffer. It is elementary that a proffer is an offer of proof, which, if accepted, obviates the need for the proponent to offer testimony or other evidence on the issue to which the proffer relates. A stipulation, on the other hand, includes an agreement between opposing counsel concerning what should constitute the evidence at trial. Clearly, an offer of proof, when accepted, becomes a stipulation. Whether or not Turner's confirmation of the State's proffer constitutes his testimony, it does not change the fact that the State stipulated to the items seized and their location when seized.

On remand, the State proposed to offer the same evidence, but to justify its admission on a different theory. The prosecutor informed the court that, contrary to testimony at trial and the prosecutor's stipulation, six of the subject seven items were never seized from the petitioner's motel room pursuant to the search warrant; rather, they were seized by the Las Vegas Police Department, incident to the petitioner's lawful arrest. The prosecutor proffered, therefore, that Turner would testify at the second suppression hearing, that the testimony he gave at the first trial was "mistaken," and that he realized his error only when reviewing the files in the State's Attorney's office in preparation for the retrial.[3] The prosecutor also acknowledged that he too "had missed it," explaining:

> Your Honor, this was a complicated trial in which the officers already indicated that there were hundreds of pieces of evidence that were seized * * * This information was provided in discovery from the very beginning ... I missed it ... I can tell the court feels terrible about what happened, but I guess the point of the matter is that I don't think the State should be punished when we have adequately shown to you that it was not taken from the El Rancho.

Adding "I don't think it serves the ends of justice or serves the ends of the laws that exist in this State to suppress that information when clearly it was not found within the El Rancho Hotel," he argued that the custodial items "were not seized pursuant to the warrant, ... were never the subject of

---

3. Officer Turner testified that Officer Thomson, another Maryland investigating officer, photocopied both a property custodian's inventory list and Tu's papers and documents that were being held in the custody of the Las Vegas authorities. He further stated that when Tu was returned to Maryland, the Nevada authorities transferred the custody of Tu's belongings to them. Officer Turner then testified that, "I looked at the photocopies and saw that the Silver Dragon card was photocopied, saw that the greeting card was photocopied, and some other things were photocopied as well, which led me to believe that my testimony initially had been an error, and these items were in fact from Mr. Tu's personal property as opposed to being from the proceeds from the search warrant of his room at the El Rancho Hotel." Officer Thomson corroborated this testimony.

the [Court of Special Appeals'] opinion in this case, not governed by the opinion in this case, and therefore available and admissible for the State in the retrial." [4]

Notwithstanding that the record was clear that the State stipulated that the items at issue were seized from the petitioner's motel room, the circuit court ruled "that the State's position prevails in this case, and the items as requested will be received at trial." Affirming that ruling, the majority holds that "the custodial items were not barred by the law of the case doctrine," Majority op. at 428, a holding that has far reaching and potentially dangerous ramifications. Accordingly, I dissent.

As long ago as 1867, this Court stated, referencing the law of the case doctrine:

No principle is better established than that a decision of the Court of Appeals once pronounced in any case is binding upon the court below and upon this Court in the subsequent proceedings in the same case, and cannot be disregarded or called into question. It is the law of the case binding and conclusive upon the parties, not open to question or examination afterwards in the same case.

*Waters v. Waters*, 28 Md. 11, 22 (1867). More recently, we explained it thusly:

[P]rior to the creation of the intermediate appellate court, this Court had established a firm judicial policy against the piecemeal trial of cases. We refused to allow successive appeals in a case that posited the same questions that had been previously decided by this Court in a prior appeal of the same case. We forbade the parties, on any subsequent appeal of the same case, to raise any question that could have been raised in the previous appeal on the record as it existed in the trial court. We stated our position and the

---

4. Contrary to the prosecutor's suggestion made during argument that Officer Turner had testified mistakenly only with regard to two of the items of evidence, on cross-examination, Turner, himself, testified that his prior testimony was that all of the disputed items came from the petitioner's motel room.

reasons therefor rather cogently in *Fidelity–Baltimore Nat'l Bank & Trust Co. v. John Hancock Mut. Life Ins. Co.,* 217 Md. 367, 372, 142 A.2d 796, 798 (1958):

> Once this Court has ruled upon a question properly presented on appeal, or, if the ruling be contrary to a question that could have been raised and argued in that appeal on the then state of the record, as aforesaid, such a ruling becomes the "law of the case" and is binding on the litigants and courts alike, unless changed or modified after reargument, and neither the question decided nor the ones that could have been raised and decided are available to be raised in a subsequent appeal. (Citations omitted).

*Loveday v. State,* 296 Md. 226, 229, 462 A.2d 58, 59 (1983). *See also Korotki v. Springer,* 218 Md. 191, 193–194, 145 A.2d 767, 768 (1958) (the law of the case applies whether the judgment on appeal is reversed or affirmed and it applies to "all matters decided by the appellate court"). This is consistent with the universal application of the doctrine in both federal and state courts. *See Gohman v. St. Bernard,* 111 Ohio St. 726, 146 N.E. 291, 292 (1924), in which it is said:

> It is a rule of general application that the decision of an appellate court in a case is the law of that case on the point presented throughout all the subsequent proceedings in the case in both the trial and the appellate courts, and no question necessarily involved and decided on that appeal will be considered on a second appeal.

*See also United States v. United States Smelting Refining & Mining Co.,* 339 U.S. 186, 198, 70 S.Ct. 537, 544, 94 L.Ed. 750, 761 (1950); *Barrett v. Baylor,* 457 F.2d 119, 123 (7th Cir. Ill.1972); *Pincus v. Pabst Brewing Co.,* 752 F.Supp. 871, 872–873 (E.D.Wis.1990); *Kowis v. Howard,* 3 Cal.4th 888, 12 Cal.Rptr.2d 728, 729, 838 P.2d 250, 251 (1992); *In Re Estate of Baird,* 193 Cal. 225, 223 P. 974, 978 (1924); *Alumet v. Bear Lake Grazing Co.,* 119 Idaho 946, 812 P.2d 253, 257 (1991); *Stroh Brewery Co. v. Director of New Mexico Dep't of Alcoholic Beverage Control,* 112 N.M. 468, 816 P.2d 1090, 1096 (1991).

Important and well founded policy considerations underlie the law of the case doctrine. By its application, piecemeal appeals are avoided, thus furthering the judicial goals of economy, fairness, and finality. As a consequence, a party to a case is denied a second opportunity to litigate an issue which has already been tried and decided in the same case; that party is not given a second bite of the apple, especially, when due to his or her own negligence or incompetence, the first one was insufficient. Moreover, the doctrine recognizes that if litigants are permitted to prosecute consecutive appeals on different theories whenever an earlier theory has proven unsuccessful, the goal of finality will become more, rather than less, elusive. On this point, this Court has observed:

[If the concept of finality did not include both questions decided and those that could have been decided] ..., any party to a suit could institute as many successive appeals as the fiction of his imagination produced new reasons to assign as to why his side of the case should prevail, and the litigation would never terminate.

*Fid.–Balto. Bank v. John Hancock,* 217 Md. at 372, 142 A.2d at 798. *See also Chayt v. Board of Zoning Appeals,* 178 Md. 400, 403, 13 A.2d 614, 615 (1940).

I acknowledge, as our cases also recognize, that the law of the case doctrine is not totally inflexible. *See Loveday,* 296 Md. at 229, 462 A.2d at 59 (emphasis added) ("We refused to allow successive appeals in a case that posited the *same* questions that had been previously decided by this Court in a prior appeal of the same case"); *Korotki,* 218 Md. at 194, 145 A.2d at 768 ("Some of the cases intimate that something in the nature of a bill of review might lie for newly discovered evidence or perhaps fraud, even after affirmance in whole or in part by this Court"). Indeed, it is well settled that the doctrine does not apply when "one of three 'exceptional circumstances' exists: the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision on the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice." *Smith International, Inc. v. Hughes Tool Compa-*

*ny,* 759 F.2d 1572, 1576, (Fed.Cir.1985). For obvious reasons, the majority wisely does not rely on the latter two of those exceptions. No contrary decision of the law applicable to the issue in this case has intervened. The decision of the Court of Special Appeals in *Tu I* was not clearly erroneous in light of the facts on which it was decided.

Instead, the majority adopts the exception championed by the intermediate appellate court: "[t]he 'law of the case' doctrine does not preclude reconsideration of an issue decided in an earlier appeal if the evidence on remand is substantially different." *See Tu v. State,* 97 Md.App. 486, 497, 631 A.2d 110, 115 (1993), *(Tu II )*. According to the majority, where the appellate opinion reversing the defendant's conviction does not contain express directions as to the scope of the remand proceedings,

> [t]he erroneous denial of a motion to suppress does not, in and of itself, preclude any trial court reconsideration of the admissibility of the State's evidence that was the subject of the suppression motion, at least if the reconsideration presents a legal theory that was not ruled upon on the prior appeal. Further facts that are relevant to applying their previously unadjudicated legal theory and that were not previously presented may be considered by the trial court, even if those facts were known to the State at the time of the original trial court ruling.

Majority op. at 420. This interpretation, the majority states, is "distilled" from *United States v. Shotwell Manufacturing Co.,* 355 U.S. 233, 78 S.Ct. 245, 2 L.Ed.2d 234 (1957) and *Giordenello v. United States,* 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958).

The majority thus clearly sanctions the relitigation, using facts known to the State at the time of the initial proceedings, of a previously decided suppression motion, so long as the proponent advances a legal theory that was not the basis of

the court's prior ruling.[5]  What is not so clearly stated, but, nevertheless is implicit, given the facts of this case, is that reconsideration is proper even when the viability of the new theory depends upon testimony that directly conflicts with the testimony and, in this case, the stipulation offered at the earlier suppression hearing and trial.  In other words, as interpreted by the majority, the "substantially different" evidence exception allows the State to justify the reconsideration of the admissibility of previously suppressed evidence by, itself, providing a different version of the facts previously offered, unsuccessfully, in opposition to the defendant's motion to suppress.  According to the majority, therefore, evidence offered at a second hearing is "substantially different" if it was not offered at the first one; it need not be "newly discovered." Furthermore, in this case, admissibility is not affected by the State's responsibility for the record on which the Court of Special Appeals relied when it decided *Tu I*, or its responsibility to work its way through any confusion which may be caused by an admittedly complex case.

Whether analyzed simply on its unique facts or on the basis of the law of the case doctrine, the majority is just plain wrong.  The law of the case aside, the State cannot be permitted to change its stipulation, presumably made in good faith and certainly on which the parties and the courts clearly relied, whenever it learns that the theory it had espoused is not viable.  Unless there is good cause, *i.e.*, a showing that it was induced into making the stipulation by the defendant, that

---

**5.**  The majority does not take account of the fact that a litigant may, and should, if feasible, present alternative theories of admissibility at a suppression hearing.  Indeed, the litigant who chooses to place all of his or her eggs in one basket, may be barred from using an alternative theory at a subsequent hearing.  *See Loveday v. State*, 296 Md. 226, 229, 462 A.2d 58, 59 (1983) ("neither the question decided nor the ones that could have been raised and decided are available to be raised in a subsequent appeal"); *Fidelity–Baltimore Nat'l Bank & Trust Co. v. John Hancock Mut. Life Ins. Co.*, 217 Md. 367, 372, 142 A.2d 796, 798 (1958) ("We forbade the parties, on any subsequent appeal of the same case, to raise any question that could have been raised in the previous appeal"). Adopting the majority's approach would potentially greatly expand the appellate process, a result the law of the case doctrine strives to avoid.

the defendant otherwise has responsibility for the State's mistake in that regard, or "grounds which would justify the setting aside of a contract such as mutual mistake, fraud, invalidity and the like," *Peddicord v. Franklin,* 270 Md. 164, 175, 310 A.2d 561, 567 (1973), the State is bound by the stipulation. *Id.; Benson v. Mays,* 245 Md. 632, 639, 227 A.2d 220, 224 (1967) (Where all of applicable evidentiary facts were stipulated between counsel, the lower court accepted the stipulation, and its opinion was based on truth of facts so stipulated, the stipulation was held binding on appellant and he could not disclaim its effect on appeal); *C & K Lord, Inc. v. Carter,* 74 Md.App. 68, 536 A.2d 699 (1988) (stipulation has binding force of contract and will not be set aside absent showing of good cause such as collusion, fraud, mutual mistake or other grounds that would justify setting aside of contract); *Oubre v. District of Columbia Dep't of Employment Servs.,* 630 A.2d 699, 702 (D.C.1993) (Stipulation of facts is binding upon parties to litigation and upon courts); *Joyner v. Jonathan Woodner Co.,* 479 A.2d 308, 311 (D.C.App.1984) (generally matters stipulated to at trial cannot be argued on appeal); *Baker v. Reese,* 372 S.W.2d 788, 789 (Ky.1963) ("The court is bound [by stipulation] in the absence of some reason to invalidate it."); *Wagner v. Myers,* 355 Mich. 62, 93 N.W.2d 914, 917 (1959) (setting aside a stipulation carries a heavy burden of persuasion, since every presumption of judicial care, of professional competence, and of decretal stability is against the overthrow, in the appellate court, of such stipulations and orders and decrees based thereon); *Marrujo v. Chavez,* 77 N.M. 595, 426 P.2d 199, 202 (1967) (not sufficient reason to set aside stipulation where ample facts in the record should have alerted a person of reasonable prudence to the apparent error prior to the final agreement embodied in the stipulation.). *But see Roth v. Morton's Chefs Services Inc.,* 173 Cal.App.3d 380, 385, 218 Cal.Rptr. 684, 687 (2d Dist.1985) (A court may set aside a stipulation entered into through inadvertence, excusable neglect, fraud, mistake of fact or law, where the facts stipulated have changed or there has been a change in the underlying conditions that could not have been anticipated,

or where special circumstances exist rendering it unjust to enforce the stipulation). This is especially the case where, as here, not only did the parties rely on the stipulation, but it formed the basis for the decision of both the trial court and the appellate court that reviewed the case. The fact that the State offered testimony in corroboration of the stipulation further militates in favor of the State being held bound by the stipulation.

The reasons for holding the State to its stipulation in this case are obvious. If the State is permitted to obtain admission of previously suppressed evidence upon showing nothing more than that it made a mistake, there being no contention that the defendant somehow bears responsibility for it, the requirement of competence that we demand of counsel will be severely undermined. Rather than requiring that counsel act competently and carefully, we would encourage counsel to do just the opposite. If reconsideration of a prior ruling can be obtained by offering testimony that counsel stipulated to the wrong set of facts because both counsel and the police misconstrued the evidence and the court believes that testimony, there really is no incentive to take care when reviewing cases or making stipulations. Indeed, because a change in fact pattern will almost always require that a new theory be advanced, on remand, reconsideration will almost always be possible. Therefore, careful preparation may come to be seen as too risky; careful preparation would insure a party only one opportunity to suppress the evidence, rather than the two that it could get if it were sloppy. Moreover, this rule is very susceptible to fraud and perjury. To be sure, a change in testimony, in many instances, may be honest and legitimate, *albeit* the result of negligence; however, whenever the change in testimony need be based on nothing more substantial than that presented in this case, it is not at all inconceivable that it may constitute perjury. And it is no answer that the judge must believe the witness or that the instances in which actual perjury is involved may be few. The danger is that the rule the majority adopts permits perjury, which, as a matter of

policy, cannot be countenanced, however few the actual instances.

The majority fares no better under the law of the case analysis. In fact, none of the cases upon which it relies actually supports its position.

In *Shotwell,* the respondents were convicted of tax evasion. The Circuit Court of Appeals for the 7th Circuit reversed their convictions, holding that the admission of evidence they voluntarily disclosed in order to obtain immunity from criminal prosecution violated their privilege against self-incrimination. While the case was pending in the Supreme Court on petition for certiorari, the Government moved for a limited remand to the District Court for further proceedings, in which it proposed to prove, via the testimony of two witnesses who had not previously testified, that the respondents' earlier testimony was perjured and fraudulent, thus, undermining the appellate's court decision. Granting the Government's motion, the Court analyzed the Government's motion in terms of what would have been allowed had the posture of the case been remand after reversal. It pointed out that, "upon appellate reversal of a conviction the Government . . . [may] strengthen its case in any way it can by the introduction of new evidence." *Id.* 355 U.S. at 243, 78 S.Ct. at 252, 2 L.Ed.2d at 241. The Court concluded that the Government had made a convincing showing that the respondents' voluntary disclosures were perjured and fraudulent and suggested that the proffered evidence would have been admissible in that posture of the case. It therefore remanded the case to the district court to give the Government, "in the peculiar circumstances," "a similar opportunity here." *Id.*

*Shotwell Manufacturing Co.,* I submit, at best, stands for the unremarkable proposition that a suppression ruling "should not be construed as binding at a new trial where substantial newly discovered evidence is available." *Id.* at 252, 78 S.Ct. at 256–257, 2 L.Ed.2d at 246 (Black, J., dissenting). Although atypical of a law of the case action, the appellate court having remanded the case without making a

final determination of the issue presented, it nevertheless may be relevant to the point for which the majority uses it, to define the "substantially different" evidence exception. It is clear, however, that it does not support the majority's interpretation of that exception. The evidence at issue in *Shotwell Manufacturing Co.* was not known at the time of the initial proceedings; rather, "[i]n support of its motion the Government ... filed with the Court the affidavits ... which they executed after the Government filed its petition for certiorari." *Id.* at 239, 78 S.Ct. at 249, 2 L.Ed.2d at 238. Indeed, to the extent that *Shotwell Manufacturing Co.* addresses the "substantially different" evidence exception, the version it references is antithetical to that which the majority adopts. An allegation of fraud or perjury necessarily involves evidence not known when the testimony constituting the fraud or perjury was given.

*Giordenello* similarly does not help the majority. There, a federal officer obtained a warrant for the petitioner's arrest. The complaint on which the arrest warrant was based contained no allegation that the officer had personal knowledge, failed to indicate the source of the officer's belief that the petitioner was trafficking drugs, and did not set forth any other basis upon which probable cause could be found. The petitioner was arrested pursuant to the warrant and drugs in his possession were seized. The trial court denied the petitioner's motion to suppress that evidence and the Texas Court of Appeals affirmed. In the Supreme Court, the Government sought to justify the arrest on an alternative basis, which it had not previously argued. The Court refused to consider it, in the process also rejecting the Government's *Shotwell Manufacturing Co.* argument:

> "The facts on which the Government now relies to uphold the arrest were fully known to it at the time of trial, and there are no special circumstances suggesting such an exceptional course."

*Id.* 357 U.S. at 488, 78 S.Ct. at 1251, 2 L.Ed.2d at 1511 (citation omitted). It added, however:

This is not to say, however, that in the event of a new trial the Government may not seek to justify petitioner's arrest without relying on the warrant.

*Id.*

Emphasizing the latter sentence, the majority concludes that the Government's new theory could be raised on remand and that facts of which the Government had knowledge when it defended the first suppression motion could be used in support. Because *Giordenello* specifically authorized consideration of a new theory on remand, it is too broad a reading to "distill" from it a general rule that it is always proper, when an appellate court reverses, to relitigate the issue reversed using a theory not previously litigated.[6] Such an expansive reading is also inconsistent with the law of the case doctrine in that it undermines the concept of finality.[7] Notwithstanding the majority's assertion that it "distilled" its holding from *Shotwell Manufacturing Co.* and *Giordenello,* it really is a hybrid of the "substantially different" evidence exception, which, as the majority applies it, can only leave confusion in its wake.

The majority also contends that *State v. Grosvenor,* 402 N.W.2d 402 (Iowa 1987), is "[i]ndistinguishable from the instant matter." Majority op. at 420. On the contrary, *Grosve-*

---

6. The proviso in that case does not necessarily refer to the ground the Government sought to raise on appeal. On remand, the Government is, of course, free to strengthen its case with other evidence, not only that to which the Court specifically referred in the opinion. Moreover, the fact that a defendant's arrest may be proven to be legal does not mean that the evidence previously suppressed thereupon is admissible. In *Giordenello v. United States,* 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), the Court specifically declared the evidence suppressed; conspicuously, it did not state that the suppressed evidence could subsequently be admitted, after reconsideration of the arrest issue, which it also specifically authorized, on remand.

7. In *United States v. Salazar,* 805 F.2d 1394, 1400 (9th Cir. Cal.1986), like in *Giordenello v. United States,* 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), the court specifically authorized the trial court to reconsider the admissibility of the previously suppressed evidence on an alternative, and not previously litigated, theory.

*nor* is readily distinguishable.[8]   Notwithstanding that the court used a "substantially different" evidence rationale, the result in that case is more appropriately explained under the "clearly erroneous/manifest injustice" analysis.

In *Grosvenor*, the defendant was convicted of possession of marijuana with intent to deliver and possession of psilocybin. His convictions were reversed on appeal to the Iowa Court of Appeals, which held that the search warrant, pursuant to which the subject contraband was seized, did not authorize a search of the defendant's room.   That court's opinion stated that the defendant's wallet was among items unlawfully seized from that room.   The record of the first trial reflected, however, that the wallet was seized incident to the defendant's arrest; the arresting officer testified, according to the first trial transcript, "After discovery of the marijuana near his room, [the defendant] was placed under arrest by me for the marijuana, and following his arrest I removed from him this wallet containing $877." *Id.* at 404.   Prior to the second trial, "the trial court reserved ruling on the motion [to suppress], concluding that a fact issue existed concerning where and when defendant's wallet was taken from his person." *Id.*   At the retrial, the trial court admitted evidence offered by the State tending to prove that "the defendant's wallet was not seized from the defendant's room but was removed from defendant's trouser pocket in a search of the defendant's person which occurred outside the residence after his arrest." *Id.*   The Iowa Supreme Court affirmed.   Noting that "the facts before the court upon the second trial are materially

---

**8.**   In that case, the law of the case test applied was the "doctrine does not preclude consideration of issues that could have been, but were not, raised in the first appeal." *State v. Grosvenor,* 402 N.W.2d 402, (Iowa 1987).   That is not the Maryland test. *See Loveday v. State,* 296 Md. 226, 229, 462 A.2d 58, 59 (1983) ("neither the question decided nor the ones that could have been raised and decided are available to be raised in a subsequent appeal"); *Fidelity–Baltimore Nat'l Bank & Trust Co. v. John Hancock Mut. Life Ins. Co.,* 217 Md. 367, 372, 142 A.2d 796, 798 (1957) ("We forbade the parties, on any subsequent appeal of the same case, to raise any question that could have been raised in the previous appeal ...").

different from those appearing upon the first," *Id.* at 405, it applied the "substantially different" evidence exception.

The officer in *Grosvenor*, did not change his testimony; at best, he merely clarified it. Moreover, and most important, the Court of Appeals—not the prosecutor, and certainly not the arresting officer—misinterpreted the evidence. The record of the first trial was clear, the officer seized the defendant's wallet incident to his arrest and not from a jacket in the closet in the defendant's room. As indicated, because the appellate court clearly and erroneously misconstrued the record in the case below it, this case is more readily explained on the "clearly erroneous" exception to the law of the case doctrine.

To be sure, between the reversal and the remand, further investigation may uncover new evidence. The "substantially different" evidence exception to the law of the case doctrine undoubtedly is designed to allow for that contingency. Consequently, the exception must contemplate that "substantially different" evidence and "newly discovered" evidence are one and the same. *See Smith Intl., Inc.*, 759 F.2d at 1579; *People v. Roybal*, 672 P.2d 1003, 1006 (Colo.1983); *Ulmet v. United States*, 17 Cl.Ct. 679, 693 (1989). Because it does not so treat them, the majority's interpretation of the exception in this case is erroneous.[9]

---

9. The majority also does not heed the admonition that "[an] appellate court should reconsider a point of law previously decided on a former appeal only as a matter of grace, and not as a matter of right." *In re Adoption of Baby Girl "C"*, 511 So.2d 345, 349 (Fla.Dist.Ct.App.2d Dist.1987) (quoting *Strazzula v. Hendrick*, 177 So.2d 1, 4 (Fla.1965)). A party ought not be able to reserve for presentation, on sequential appeals, as many legal theories as it has or as it may be able to hypothesize. "Because application of any of these exceptions of the law of the case doctrine could alter the results of the decision of the appellate court, [it must follow that] exceptions should be narrowly construed and only utilized when the situation, specifically and unequivocally or unquestionably requires an exception's application." *Ulmet v. United States*, 17 Cl.Ct. 679, 681 (1989). Consequently, courts that have applied the exceptions to the law of the case have done so only in the rarest of circumstances.

No other court has interpreted the "substantially different" evidence exception as the majority does. Not one of the smattering of courts that have employed it has considered a State witness' testimony that is reconsidered and, therefore, diametrically different from that which he or she gave at the prior proceedings, to be "substantially different," so as to trigger a reconsideration of the admissibility of previously suppressed evidence. Indeed, most courts have refused to apply the "substantially different" evidence exception when the proffered evidence could have been offered during the first proceedings.

In *Smith Intl., Inc., supra.,* Smith International, Inc. (Smith) filed a complaint against Hughes Tool Company (Hughes), seeking a declaratory judgment that a Hughes patent was invalid. Hughes filed a counterclaim, asserting that Smith had infringed not only the subject patent, but another patent as well. Following a trial, the district court found both of the Hughes' patents to be invalid. The Court of Appeals for the Ninth circuit reversed on the grounds that Smith had not met its burden of proving Hughes' patents invalid. The court reinstated Hughes' patent infringement claim, and remanded the case for further proceedings on the counterclaim. On remand, Hughes' motion for a preliminary injunction enjoining Smith's use of one of its patents was denied and Hughes appealed to the Court of Appeals for the Federal Circuit. The court reversed and remanded with instructions to issue the injunction. On remand, Smith moved the district court for partial summary judgment in its favor or to order a separate trial, or, in the alternative, to dissolve the preliminary injunction. Proffering evidence that he claimed was "new evidence," Smith proposed to prove that Hughes defrauded the patent office to obtain its original patent. The district court concluded "that Smith either was aware of this new evidence or could have discovered it by reasonable diligence before the trial of the case," *id.* at 1578, hence "Smith ha[d] no new evidence". *Id.* at 1579.

Smith argued, on appeal that "the ground for the exception of the law of the case doctrine is the existence of 'substantially

different' and not 'newly discovered' evidence." *Id.* at 1579. Affirming, the Court of Appeals for the Federal Circuit observed that the "substantially different" evidence exception serves the same purpose as the "newly discovered" evidence requirement, concluding that, "the district court's interpretation of that exception furthers the underlying purpose of the law-of-the-case doctrine," *id.,* "to 'provide finality to judicial decisions.'" *Id.*

To the same effect is *People v. Roybal,* 672 P.2d 1003 (Colo.1983), in which the Supreme Court of Colorado refused to allow, in a second proceeding, evidence the prosecutor chose not to use during the first proceeding. In that case, a police officer investigating an automobile accident, in which the defendant was involved, noticed that the defendant smelled of alcohol. After his arrest, the defendant gave a written statement about the collision. He later took a blood alcohol test at the police station. The defendant moved to suppress both the statement and evidence concerning the blood alcohol test. Although the trial court suppressed the statement, ruling, as the defendant had argued, that the smell of alcohol alone did not establish probable cause for arrest, it admitted the blood alcohol test. *Id.* at 1004. The former ruling was affirmed on the State's interlocutory appeal. *Id.* On remand, the defendant again moved to suppress the blood alcohol test, arguing, this time, that it was the product of an illegal arrest.[10] Without objection, and, in fact, agreeing that an evidentiary hearing on the issue was appropriate, *id.,* the prosecutor countered by offering testimony not offered at the first suppression hearing to prove that there was probable cause for the arrest. The trial court refused to consider it, reasoning that the Supreme Court's previous ruling was the law of the case. The Supreme Court affirmed, stating:

---

**10.** Initially the defendant sought suppression on an alternative basis: he asserted a due process deprivation because the blood samples had been destroyed and contended that the evidence was inadmissible due to lack of consent. *People v. Roybal,* 672 P.2d 1003, 1004 (Colo.1983).

[T]he only explanation the prosecution offers as to why these witnesses were not brought forward at the first hearing is that it did not anticipate that the trial court would rule that there was no probable cause. The amount of the available evidence that the prosecution elects to present at a suppression hearing is left to the district attorney's discretion. However, unless suppression hearings are to be conducted "by installment," as the trial court put it, the prosecution must be prepared to abide the consequences of an adverse ruling when it elects not to offer available probative evidence.

*Id.* at 1006. In a footnote, the court acknowledged the "substantially different" evidence exception, distinguishing between evidence that was available at the first proceeding, and "newly-discovered" evidence:

If the prosecution had proffered newly-discovered evidence, the result might be different. A trial court may reconsider its own suppression order when there is *new, probative evidence available* and the prosecution shows *good cause why that evidence was not introduced previously.* 3 W. LaFave, *Search and Seizure,* § 11.2(f) at 527 (1978). Even where a trial court's suppression order has been affirmed on interlocutory appeal, we believe that in appropriate circumstances newly-discovered evidence could justify the trial court's reconsideration of its earlier ruling. Here, however, the evidence that the prosecution now wishes to adduce was available at the first hearing, but the district attorney made a tactical decision not to present it.

*Id.,* n. 7 (emphasis added). *See also Ulmet v. United States,* 17 Cl.Ct. 679, 681 (1989), in which the court reasoned that "the 'substantially new' evidence exception appears to contemplate a situation in which a case is remanded to the lower court and new facts are developed following the remand, after which, on further appeal, the appellate court changes its original opinion based on the new evidence." *Id.* at 693.

In this case, the State lost the suppression hearing on appeal because the evidence it stipulated to did not support

the legal theory it argued. It now asks us to sanction the reconsideration of the admissibility of that evidence on the basis of a new legal theory, not previously used, based upon facts that, far from being newly discovered, should have been fully known at the time of the first proceedings, but which both the investigating officer and prosecutor, for no reason other than neglect, allegedly misconstrued. The correction of its former evidence, we are told, is a sufficient basis on which to support the finding that the record on remand is substantially different. That the intermediate appellate court in *Tu* II, "did not declare the items to be inherently and generically inadmissible," and the mandate did not specifically state that they were, are seen as additional support for this position.

We have already seen that this approach is directly contradicted by the manner in which most courts view the "substantially different" evidence exception. Conceding, however, that the record in this case is rendered different by the change of testimony, it certainly is not "substantially different." The record on remand is based on the same evidence as formerly presented. The contested items are the same. The witnesses are the same. All that has changed is the testimony of a witness.

No exception to the law of the case doctrine covers this situation. The majority simply creates an exception to the exception under which the State is rewarded for its incompetence and negligence. It also provides fertile ground for perjury. It is clear that the State should have known that the items were seized by the Las Vegas police, incident to the petitioner's arrest, rather than in plain view in his motel room. As such, the State should be treated as having chosen not to use available evidence. It has been held that "[a] departure from the law of the case was not warranted when the plaintiff's intentionally had chosen not to use the "new evidence" at trial." *Baumer v. U.S.*, 685 F.2d 1318, 1321 (11th Cir.1982). I would submit that a departure from the law of the case is not warranted when a litigant should have known of pertinent facts, did not present them, and cannot show good cause why they were not introduced previously.

Under such circumstances, the "substantially different" evidence standard is simply not met. The holding in this case increases the likelihood, significantly, I submit, that, in subsequent cases, remanded after reversal for failure to suppress evidence, perjured testimony will be proffered as the basis for, in effect, reversing the appellate decision.

The petitioner argues that the "mandate rule" [11] precludes the admission of the contested items. That argument is not without merit. The "mandate rule," generally provides that "what remains within the power of decision of the court after remand depends ... on the scope of the mandate." Moore ¶ 0.404[10], at II–61. *Id.* The petitioner asserts that, unless the mandate specifically reserves the right of the State to proceed on an alternate theory, the State is precluded from relitigating the suppression issue. Like the State, which believes that a specific reservation adds nothing to the usual operation of the rule, he relies on *State v. Edwards*, 214 Conn. 57, 570 A.2d 193 (1990), and *United States v. Eubanks*, 591 F.2d 513 (9th Cir.1979). The majority concludes that "the rule advocated by the State is better," Majority op. at 423, thus overlooking significant and critical factors.

Ordinarily, the admissibility of "newly discovered", "substantially different" evidence is determined by the appellate mandate. "While a mandate is controlling as to matters within its compass; on the remand a lower court is free as to other issues." *Sprague v. Ticonic National Bank*, 307 U.S. 161, 168, 59 S.Ct. 777, 781, 83 L.Ed. 1184 (1939). It is, therefore, critical that the issues decided by the appellate court are known. *See Chayt v. Board of Zoning Appeals*, *supra.*, (If the order departs from the mandate either by allowing more or less than contained in its terms, it is illegal

---

11. Black's Law Dictionary defines mandate as:
"A precept or order issued upon the decision of an appeal or writ of error, directing action to be taken, or disposition to be made of [a] case, by [an] inferior court. Official mode of communicating judgment of appellate court to lower court, directing action to be taken or disposition to be made of cause by trial court" Blacks Law Dictionary, 962 (6th ed. 1990).

and subject to review by the court); *Schapiro v. Baltimore Trust Co.*, 143 Md. 50, 53, 121 A. 849, 850 (1923) ("The principal question presented at the threshold of the case is whether the decree of the lower court * * * conforms to and is in accordance with the opinion and mandate of this Court on the former appeal. If so, it is the law of the case binding and conclusive upon this Court, the court below, and all parties in subsequent proceedings in the same case, and cannot be disregarded by us"). *See also Wheeler v. Pleasant Grove*, 746 F.2d 1437, 1440 (11th Cir.1984); *Seese v. Volkswagenwerk, A.G.*, 679 F.2d 336, 337 (3rd Cir.1982); *Cleveland v. Federal Power Comm'n*, 561 F.2d 344, 346 (D.C.Cir.1977).

As we have seen, the majority and the petitioner read those cases in which the appellate mandate expressly authorizes what can be introduced on remand quite differently. *See Edwards*, 570 A.2d at 203; *Eubanks*, 591 F.2d at 521. While the majority says they simply state what would be admissible under an exception to the law of the case doctrine, the petitioner maintains that the absence of an enabling mandate absolutely precludes the trial court from reconsidering the factual underpinnings of the previously decided issue, that, in other words, no additional evidence may be considered. I reject both approaches. The law of the case is not implicated when the mandate itself authorizes the introduction of additional evidence or reliance on an alternate theory. On the other hand, the absence of an enabling mandate or any implication that can be inferred from the mandate,[12] means only that the exceptions to the law of the case doctrine apply—that, for example, a threshold showing that the proffered evidence is newly discovered and, therefore, substantially different, must be made.

In this case, the intermediate appellate court reversed the judgment of the circuit court and remanded the case for a new

---

12. The majority fails to point out that any implication that can be logically inferred from a mandate may also bar subsequent litigation on the subject. *See Pincus v. Pabst Brewing Co.*, 752 F.Supp. 871, 873 (E.D.Wis.1990) (Issues decided either expressly or by necessary implication will be binding on remand and on subsequent appeal).

trial. Because its mandate did not authorize a relitigation of the suppression issue, the law of the case doctrine applied; the State had to demonstrate the applicability of an exception to the doctrine if it hoped to gain admissibility of the suppressed evidence. The State did not even attempt to show that its proffered new legal theory was based upon "newly discovered," "substantially different" evidence, or fell within another of the exceptions, nor could it. And as we have shown, neither has the majority been able to fit this case within the "substantially different" evidence exception. Hence, the circuit court's reconsideration of the admissibility of the subject evidence was error, being violative of the holding in *Tu I*.[13]

---

**13.** In an effort to reconcile the disparity of its holding with the mandate rule, the majority also attempts to distinguish the case *sub judice* and *Korotki v. Springer*, 218 Md. 191, 145 A.2d 767 (1958), a case upon which Tu heavily relies. In *Korotki*, the Court recognized and left open the possibility of "something in the nature of a bill of review ... for newly discovered evidence or perhaps for fraud, even after affirmance in whole or in part," *Id.* at 194, 145 A.2d at 768; however, it made clear that, when the case has been reversed and remanded, "the order entered by [a] court in remanding [a] case, and the opinion ... on which said order is passed, shall be conclusive as to the points finally decided thereby. In such an order remanding a case, [the] court will express the purpose for so remanding and in its opinion filed with said order will determine all questions which may have been properly presented." *Id.* at 769. The majority reasons that *Korotki* is distinguishable because the *Korotki* court's mandate, "properly interpreted, had not left open any issues of liability", while "[t]he mandate in the instant matter is not so limited." Majority op. at 427. That is not a valid distinction.

The mandate in *Korotki* required "further proceedings not inconsistent with this opinion." The Court rejected the appellants' "contention ... that the chancellor erred in declining, prior to the entry of the decree, to hear evidence proffered by the appellants, and alleged to have been newly discovered." It reasoned that, because "[t]he general effect of the proffer was to disprove the facts found by this Court on the previous appeal, to rebut and discredit the testimony [at the first trial] and to show ... perjury and [subornation of] perjury," it violated the law of the case doctrine. *Id.* at 193, 145 A.2d at 768. The holding in *Korotki*, then, is much broader than the majority wants to admit. Although in *Tu I*, the mandate simply stated, "Judgment Reversed," the last sentence of the section of the opinion discussing the suppression issue was clear as to what was contemplated, "a new trial." Applying the *Korotki* rule, that mandate certainly does not sanction the retrial of the suppression issue, which the Court, on appeal, clearly decided. If the issue left open by the Court—whether review might be had upon a

The majority asserts that "a rule that would preclude correction on remand of inaccuracies in the facts at the first trial, unless the appellate court expressly permitted that to be done, is unworkable from the appellate standpoint." Majority op. at 423. On the contrary, what is unworkable is a rule that would allow alleged factual inaccuracies to be corrected simply because the moving party "made a mistake." The potential for the use of fraud in an effort to reverse an appellate mandate is tremendous. That is the effect of the majority's holding. It will open up a Pandora's box of increased litigation as to the scope of remand. Litigants will be encouraged to scan appellate opinions for new legal theories to be raised on remand and those so inclined will not be above "supplying" or manufacturing the facts to support them.[14]

Of course, a litigant, on remand, may bolster his or her case. It is true that witnesses may be more comfortable and may make better witnesses the second time around; their recollections may be more lucid. As indicated, new evidence may also become available. On the other hand, a litigant should not be allowed to use substantially *the same* evidence, in substantially *the same* way, when the effect and purpose is to circumvent an appellate decision. Therefore, the circuit court erroneously admitted the custodial items into evidence.[15] I would reverse the judgment of the Court of Special Appeals.

---

showing of newly discovered evidence or fraud—were resolved favorably to the State, it becomes important that it has proffered neither newly discovered evidence nor fraud.

**14.** The majority stresses the fact that the trial judge believed Officer Turner's change in testimony: "The circuit court at the second suppression hearing found 'that the State's position prevails in this case, and the items as requested will be received at trial,' thus necessarily finding Turner's testimony at the second suppression hearing to be the fact of the matter." Majority op. at 414. That is not a sufficient answer. What is at stake here is the integrity of the trial process. That can only be assured by adherence to precedent and to the rules which assure fair trials, including finality of judgments.

**15.** Rather than decide the merits of the petitioner's challenge to the admission of a laundry ticket taken from the petitioner's motel room on a "more specific factual explanation for applying plain view," Majority

op. at 428, the majority relies on "harmless error." Given my view of the matter, I would hold that the laundry ticket was barred by the law of the case doctrine. Moreover, for the reasons I have previously stated, most notably in *Rubin v. State*, 325 Md. 552, 591, 602 A.2d 677, 696 (1992) (Bell, J., Dissenting), its admission into evidence was far from harmless.